**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-2211

EDUARDO ANTONIO RODRIGUEZ-ARIAS,

Petitioner,

v.

MATTHEW G. WHITAKER, Acting Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: October 30, 2018                    Decided: February 12, 2019

Before FLOYD and HARRIS, Circuit Judges, and Donald C. COGGINS, United States District Judge for the District of South Carolina, sitting by designation.

Petition for review granted; vacated and remanded by published opinion. Judge Floyd wrote the opinion, in which Judge Harris and Judge Coggins joined.

**ARGUED:** James Feroli, CATHOLIC CHARITIES IMMIGRATION LEGAL SERVICES, Washington, D.C., for Petitioner. Margot Lynne Carter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Jennifer Bibby-Gerth, CATHOLIC CHARITIES IMMIGRATION LEGAL SERVICES, Washington, D.C., for Petitioner. Chad A. Readler, Acting Assistant Attorney General, Terri J. Scadron, Assistant Director, Leslie McKay, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

FLOYD, Circuit Judge:

Eduardo Rodriguez-Arias (Rodriguez), a native of El Salvador, petitions for review of the final order of the Board of Immigration Appeals (BIA) affirming the denial of his claim for protection under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT). We grant his petition for review of his CAT claim, vacate the BIA's order with respect to that claim, and remand for further proceedings consistent with this opinion.

I.

Rodriguez fled El Salvador's rampant gang-related violence and crime in 2005, when he unlawfully entered the United States as a twelve-year-old. At that time, his grandparents were being extorted by the gangs, he himself had been robbed twice by them, and his teenage cousin had been killed after refusing to join them. The cause of Rodriguez's flight now forms part of the basis for his claim for relief: Rodriguez fears being returned to El Salvador due to the country's continued high rate of gang-perpetrated violence. But what's more, he now also fears violence at the hands of anti-gang vigilante groups and the state police because today he bears the insignia of gang affiliation on his body—gang-related tattoos.

After he arrived in the United States, Rodriguez moved to Maryland and joined Sureños 13, a United States-based gang with no presence in El Salvador. Due to his affiliation with Sureños 13, Rodriguez obtained multiple tattoos that identify him as a gang member. These include the word "Sureños" on his chest, the phrase "Brown Pride" on his

2

stomach, "BPS" and "13" on his left hand, the letter "S" above each of his knees, and "BPS" on his back. A.R. 951–56. Although Rodriguez left Sureños 13 in 2011 or 2012, and has had a face tattoo removed, his other explicitly gang-related tattoos remain.

After he was placed in removal proceedings, Rodriguez sought relief from removal under the CAT.[1] He received an evidentiary hearing before an Immigration Judge (IJ) on May 16, 2016. At the hearing, Rodriguez testified that he fears returning to El Salvador. Because of his tattoos, he expects to be targeted by the violent gangs that plague the country, who will see him as a rival; by anti-gang vigilante groups, who engage in extrajudicial killings of gang members to protect their communities; and by the police, who use extreme violence in their anti-gang efforts. Rodriguez explained in his testimony that in El Salvador, having tattoos is seen as an automatic sign of gang membership and people do not bother investigating whether you are still an active gang member before harming you. Confirming his fears, a friend of his who, like Rodriguez, had once belonged to Sureños 13 was killed within a week after being deported to El Salvador.

Indeed, Rodriguez testified that even after he left Sureños 13, his tattoos have made him a target of violence at the hands of Salvadoran gangs operating in the United States. On one occasion, he was chased by ten to twenty men dressed in blue, the color worn by the notorious Mara Salvatrucha or MS-13 gang. On another occasion he was walking near his home when an MS-13 member struck him with a bat, and on still another occasion

---

[1] Rodriguez also applied for asylum and for withholding of removal but did not appeal the denial of those forms of relief.

3

someone hit him with a chair when he visited a restaurant frequented by MS-13 members. Rodriguez has also been threatened by rival gangs while in immigration detention. An MS-13 member in detention told Rodriguez that as soon as he arrives in El Salvador, MS-13 will find him and kill him. Two members of the 18th Street gang told him that in El Salvador, 18th Street will look for him and will "have fun with" his body. A.R. 440.

In addition to his own testimony, Rodriguez provided evidence from five expert witnesses about how gang members or suspected gang members routinely experience extreme violence in El Salvador at the hands of other gangs, numerous vigilante groups, and police forces. He also produced the U.S. Department of State 2015 and 2014 Country Reports on El Salvador, the asylum eligibility guidelines for El Salvador from the United Nations High Commissioner for Refugees, and approximately thirty articles from various scholarly and news sources describing the appallingly violent conditions in El Salvador. In all, he provided over 300 pages of documentation.

The IJ denied Rodriguez's application for relief. She devoted less than one page of her opinion to the CAT claim and limited her risk-of-torture analysis to the risks that Rodriguez faced from gangs and the police. On appeal, the BIA remanded the case so that the IJ could address Rodriguez's risk of torture from vigilante groups as well. Nowhere in the two-page remand order did the BIA state that the IJ's original opinion had been vacated or reversed.

On remand, Rodriguez provided additional country-conditions evidence relating to his risk of torture in El Salvador. The IJ then issued a supplemental opinion, which incorporated her first opinion by reference and provided new analysis on only those topics

4

that the BIA had ordered addressed. The IJ again denied CAT relief, this time devoting three pages to the topic. On Rodriguez's second appeal, the BIA reviewed the IJ opinions together, adopted both, and supplemented them with additional reasoning. In the BIA's two pages of CAT analysis, it did not refer specifically to any of the evidence provided by Rodriguez. This petition for review timely followed.

## II.

When making a CAT claim, the alien seeking relief has the burden to show that "it is more likely than not that he or she would be tortured" in the country of removal. 8 C.F.R. § 1208.16(c)(2) (2012). Torture is defined as (1) "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person" in a manner that is (2) "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1) (2012). Public officials acquiesce to torture when, "prior to the activity constituting torture, [they] have awareness of such activity and thereafter breach [their] legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7). Public officials breach their responsibility to intervene when they engage in "willful blindness" or "turn a blind eye to torture." *Suarez-Valenzuela v. Holder*, 714 F.3d 241, 245 (4th Cir. 2013) (quoting *Ontunez–Tursios v. Ashcroft*, 303 F.3d 341, 355 (5th Cir. 2002)). Public officials need not have actual knowledge of torture to have engaged in willful blindness. *Id*. When determining whether the willful-blindness standard has been met, "immigration judges should consider evidence of past torture, evidence of 'gross, flagrant or mass violations of

5

human rights,' the country's conditions, and whether the applicant could relocate to a part of the country where he or she is unlikely to be tortured." *Id.* (quoting 8 C.F.R. § 1208.16(c)(3) (2012)).

In reviewing the denial of a CAT claim, we review the agency's finding of fact for substantial evidence. *See Marynenka v. Holder*, 592 F.3d 594, 600 (4th Cir. 2010). In the immigration context, this standard means that "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B) (2012); *Suarez-Valenzuela*, 714 F.3d at 245. Legal determinations, however, are reviewed de novo. *Hui Zheng v. Holder,* 562 F.3d 647, 651 (4th Cir. 2009). Although the BIA may be granted *Chevron* deference when it decides matters of statutory interpretation, such deference is not granted where, as here, the BIA issued a nonprecedential opinion authored by a single member. *Martinez v. Holder*, 740 F.3d 902, 909 (4th Cir. 2014); *Turkson*, 667 F.3d at 527; *see Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

We may also overturn the BIA's determinations if we conclude that the BIA abused its discretion. *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011). "The BIA may be held to have abused its discretion if it failed to offer a reasoned explanation for its decision, or if it distorted or disregarded important aspects of the applicant's claim." *Id.* Finally, because the BIA here "adopted and supplemented an IJ decision, we are obliged to review both rulings." *Id.*

III.

6

In his petition for review, Rodriguez first argues that the BIA made a legal error when it denied him CAT relief because it failed to aggregate his risk of torture from all three of the entities that he fears: gangs, vigilante groups, and the police. We agree.

The CAT implementing regulations provide that when "assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, *all evidence* relevant to the possibility of future torture shall be considered." 8 C.F.R. § 1208.16(c)(3) (2012) (emphasis added). The Ninth Circuit has read this requirement to mean that "CAT claims must be considered in terms of the aggregate risk of torture from all sources, and not as separate, divisible CAT claims." *Quijada-Aguilar v. Lynch*, 799 F.3d 1303, 1308 (9th Cir. 2015). The Third Circuit agrees. In a case where the CAT applicant feared torture from two different entities, the Third Circuit explained that "[a] proper application of the regulations . . . merely requires [the applicant] to establish that it is more likely than not that he faces torture . . . when the two entities are considered together"—in other words, when "the cumulative probability of torture by the two entities exceeds 50%." *Kamara v. Attorney General*, 420 F.3d 202, 213–14 (3d Cir. 2005) (demonstrating the aggregation analysis by adding a 27% likelihood of torture from one entity to a 28% of torture from another entity for a combined risk of torture of 55%, which merited CAT relief); *see also Matter of G-A-*, 23 I. & N. Dec. 366, 366, 368 (BIA 2002) (en banc) (explaining in a case where the CAT applicant feared that he would be tortured based on several factors, including "his religion, his ethnicity, the duration of his residence in the United States, and his drug-related convictions," that "the evidence of record, *when considered in the aggregate*, supports the respondent's contention that he would more

7

likely than not be tortured upon his return to Iran" (emphasis added)). No other U.S. Courts of Appeals have disagreed with this analysis.

We now join our sister circuits and hold that the risks of torture from all sources should be combined when determining whether a CAT applicant is more likely than not to be tortured in a particular country. That interpretation is most consistent with both the implementing regulations and our treaty obligations not to return individuals to a country where they face a substantial risk of torture. *See United States v. Belfast*, 611 F.3d 783, 806–07 (11th Cir. 2010) (explaining that "settled rules of treaty interpretation require that we construe the CAT generously"); *see also Pierre v. Gonzales*, 502 F.3d 109, 114–16 (2d Cir. 2007) (explaining that courts owe deference to the executive branch's treaty interpretation as expressed through implementing regulations). We therefore confirm that the aggregation analysis described by the Ninth and Third Circuits is required when assessing an applicant's risk of torture.

While the government concedes that the BIA should have aggregated the risk of torture that Rodriguez faces in El Salvador, it nevertheless argues that there was no error below because both the BIA and IJ did "consider Rodriguez's claim for relief cumulatively." Appellee Br. at 26. We disagree. In her first order, the IJ addressed only the risks that Rodriguez faced from gangs and the police, with no mention of vigilante groups. In her second order, the IJ simply stated: "Respondent has failed to demonstrate that it is more likely than not that he would be tortured by vigilante groups[.]" A.R. 124. At no point did she consider the aggregated risk caused by all three entities in unison by

8

adding the probability of torture from each entity and determining whether that sum exceeded 50%.

The BIA, in turn, devoted no space in its final order to aggregating risk. Instead, it asserted the rule that "[a]n alien's eligibility for [CAT] protection cannot be established by stringing together a series of suppositions to show that it is more likely than not that torture will result," unless the evidence "establish[es] that each step in the hypothetical chain of events is more likely than not to happen," citing a BIA opinion as support. A.R. 007. Then, without citing to or describing any of Rodriguez's evidence, the BIA simply stated: "[Rodriguez] has not shown that his hypothetical chain of events is more likely than not to happen." A.R. 008. But Rodriguez never attempted to prove a string of events. Instead, he has consistently asserted that due to his tattoos, he fears torture from three separate entities: police, gangs, and vigilante groups. The proper response to Rodriguez's fears is to add the amount of risk that each group poses to him and then determine whether that sum is greater than 50%. The BIA failed to do that analysis here, necessitating remand.[2]

---

[2] The BIA also cited two cases to support its determination that Rodriguez's tattoos would not put him at substantial risk of torture in El Salvador. The Court is not persuaded by these cases for several reasons. First, CAT claims are highly fact specific, which means that one applicant may be able to show a substantial risk of torture in El Salvador due to his tattoos while another may not. *Huang v. Ashcroft*, 390 F.3d 1118, 1123 (9th Cir. 2004). Second, the cases cited by the BIA are readily distinguishable. In *Castillo-Pena v. Holder*, 482 F. App'x 847 (4th Cir. 2012), the Court found that an unrepresented applicant had failed to show that it was more likely than not that he would be tortured by Salvadoran police because of his tattoos. The case did not address the combined risks posed by police, vigilante groups, and gangs in El Salvador. *Id*. at 848. In the second, *Andrade v. Lynch*, 798 F.3d 1242 (9th Cir. 2015), the Ninth Circuit affirmed the BIA's denial of CAT relief to a Salvadoran applicant who had two discreet non-gang-related tattoos. *Id*. at 1245. However, those tattoos—which were merely his and his girlfriend's initials—do not pose
(Continued)

9

Rodriguez also argues that the BIA and IJ erred by (1) failing to meaningfully engage with the live testimony and over 300 pages of documentary evidence that he originally produced in support of his claim, and (2) failing to meaningfully consider the additional evidence that he submitted on remand about the risk of torture that he faces in El Salvador. We agree.

It is an abuse of discretion for the BIA or IJ to arbitrarily ignore relevant evidence. *Baharon v. Holder*, 588 F.3d 228, 233 (4th Cir. 2009); *Tassi*, 660 F.3d at 719. "Those who flee persecution and seek refuge under our laws have the right to know that the evidence they present of mistreatment in their home country will be fairly considered and weighed by those who decide their fate." *Baharon*, 588 F.3d at 233. Therefore, it is this Court's responsibility to "ensure that unrebutted, legally significant evidence is not arbitrarily ignored by the factfinder." *Id*. Moreover, the BIA's or IJ's failure to engage with an applicant's evidence hampers our ability to meaningfully review what was decided below. *Zelaya v. Holder*, 668 F.3d 159, 168 (4th Cir. 2012). Hence, a wholesale "failure [by] the

---

the same level of risk as the plentiful and conspicuous gang tattoos on Rodriguez. Indeed, the case most similar to the one at bar was not even cited by the BIA and supports Rodriguez's CAT claim here. In *Cole v. Holder*, 659 F.3d 762 (9th Cir. 2011), a former gang member with conspicuous gang tattoos on his face, calves, arms, and back sought CAT relief because he feared that he would be tortured by the gangs, police forces, and anti-gang death squads in his native Honduras. *Id*. at 765. The Ninth Circuit vacated and remanded the BIA's denial of CAT relief because it determined that the BIA had failed to aggregate the risk of torture that these three entities posed to an individual with multiple and conspicuous gang tattoos. *Id*. at 775.

IJ and BIA to consider evidence of country conditions constitutes reversible error." *Aguilar-Ramos v. Holder*, 594 F.3d 701, 705 (9th Cir. 2010); *see also Ai Hua Chen v. Holder*, 742 F.3d 171, 179 (4th Cir. 2014) (explaining that the IJ and BIA must "offer a specific, cogent reason for rejecting evidence").

The IJ did not meaningfully address the evidence that Rodriguez provided about country conditions in El Salvador, especially the Salvadoran government's behavior towards gang members and suspected gang members. In her first opinion, she acknowledged that there are "some instances of torture of gang members and former gang members by the police in El Salvador," but then asserted that the "evidence does not support" the likelihood that the harm inflicted on Rodriguez would be with the government's acquiescence. A.R. 372. There was no other analysis. In her second opinion, the IJ admitted that "[t]he evidence does indicate that Salvadoran authorities have recently failed to address many instances of vigilante violence." A.R. 125. But she again found that Rodriguez's evidence was insufficient, this time because Salvadoran law "prohibits extrajudicial killings and violence" and there have been some efforts by the government to investigate extrajudicial killings. A.R. 125. The IJ did not address Rodriguez's extensive evidence about the government's willingness to use torture on suspected gang members or its willingness to turn a blind eye to the extreme violence between rival gangs and between gangs and vigilante groups. This evidence included:

1) El Salvador passed a law in November 2013 that protects police officers who kill in the line of duty, which resulted in a spike of extrajudicial killings, A.R. 536;
2) Salvadoran police officers routinely drop off suspected gang members in a rival gang's territory so that they will be tortured or killed by the rival gang, A.R. 536;

11

3) While El Salvador has announced investigations of several extrajudicial killings, the 2015 Country Report stated that these investigations have not resulted in any convictions, A.R. 605;

4) In January 2016, there were 738 murders in El Salvador, of which 28.6% were of alleged gang members, despite the fact that less than 2% of Salvadorans are in gangs, A.R. 567.

The IJ's failure to meaningfully engage with Rodriguez's evidence was not remedied on appeal. In its review, both originally and after remand, the BIA did not engage with Rodriguez's evidence at all.

This wholesale failure to fully consider Rodriguez's country-conditions evidence constitutes reversible error. Denying Rodriguez's claim for CAT relief required more—much more—from both the BIA and the IJ. On remand, the BIA must interact seriously with the full panoply of the risk-of-torture evidence submitted by Rodriguez, recognizing that "country conditions alone can play a decisive role in granting relief under the [CAT]." *Kamalthus v. I.N.S.*, 251 F.3d 1279, 1280 (9th Cir. 2001); *Aguilar-Ramos v. Holder*, 594 F.3d 701, 705 (9th Cir. 2010) ("[A] CAT applicant may satisfy his burden with evidence of country conditions alone."). When a man's life is on the line, he is entitled to know that the court deciding his claim reviewed all his evidence, understood it, and had a cogent, articulable basis for its determination that his evidence was insufficient. The BIA and IJ both failed to provide such a cogent, articulable basis here.

V.

In conclusion, we grant Rodriguez's petition for review of his CAT claim, vacate the BIA's decision with respect to that claim, and remand for further proceedings consistent with this opinion.

*PETITION FOR REVIEW GRANTED; VACATED AND REMANDED*