**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1693**

INGRID NOLASCO-FIGUEROA; C.R.N.; B.R.N.,

Petitioners,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

On Petition for Review for an Order of the Board of Immigration Appeals.

Argued:  May 4, 2021                                    Decided:  June 15, 2021

Before GREGORY, Chief Judge, MOTZ, and THACKER, Circuit Judges.

Denied by unpublished per curiam opinion.

**ARGUED:**  Rebekah Goncarvos Grafton, FAY & GRAFTON, Raleigh, North Carolina, for Petitioners.  John Beadle Holt, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  Ana Sofia Nunez, FAY & GRAFTON, Raleigh, North Carolina, for Petitioners.  Joseph H. Hunt, Assistant Attorney General, Claire L. Workman, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Ingrid Nolasco-Figueroa ("Petitioner"), a native of Honduras who fled to the United States in 2016, petitions for review of an order of the Board of Immigration Appeals ("BIA") affirming the Immigration Judge ("IJ")'s denial of Petitioner's claims for asylum, withholding of removal under the Immigration and Nationality Act ("INA"), and protection under the Convention Against Torture ("CAT"). Petitioner primarily argues that the IJ and BIA erred in concluding that she failed to introduce sufficient evidence to corroborate her testimony. Discerning no reversible error in the manner in which the IJ and BIA assessed Petitioner's corroborating evidence, and finding substantial support in the record for the IJ and BIA's denial of Petitioner's claims for relief, we deny the petition for review.

I.

A.

Petitioner is a 26 year old Honduran national. In 2009, while living in Colón, Honduras, Petitioner became romantically involved with a man named Paco Beltran Rivas Ramirez ("Rivas Ramirez"). Petitioner and Rivas Ramirez never married, but they had two children and lived together from 2010 until Rivas Ramirez's death in 2014.

Rivas Ramirez was shot and killed in Honduras on July 27, 2014. According to the testimony Petitioner gave during the IJ hearing related to her removal proceedings, Rivas Ramirez's death stemmed from his participation in a soccer game against a team made up of members of the Santos family. The Santos family operates a criminal drug trafficking organization in Honduras. Petitioner did not attend the soccer game against the Santos family, but she testified that one of Rivas Ramirez's sisters-in-law attended the game and

2

called Petitioner on the phone to apprise her of the tragic events that unfolded on the soccer field that day. On this phone call, Petitioner learned that Rivas Ramirez was involved in a dispute over whether he had scored a valid goal. A scuffle ensued, and Rivas Ramirez was shot and killed by an unspecified member of the Santos family.

Petitioner testified before the IJ that a few hours after she learned of Rivas Ramirez's killing, she went to the soccer field to discuss "what had happened" with those who had witnessed it. A.R. 135.[1] When Petitioner arrived at the field, Rivas Ramirez's sister-in-law informed her that, shortly after killing Rivas Ramirez, the Santos family "announced that they would kill the rest of [his] family." *Id.* at 136. Petitioner explained that "about three" other witnesses other than Rivas Ramirez's sister-in-law also confirmed to her that the Santos family issued this threat. *Id.* at 137.

Almost immediately after learning of Rivas Ramirez's death and the Santos family's threat to kill Rivas Ramirez's family, Petitioner and her two children relocated to Petitioner's grandmother's house, which was in a part of Honduras that was roughly four hours away from the soccer field where Rivas Ramirez was shot. Petitioner explained to the IJ that the impetus for her decision to move to her grandmother's house was her fear that the Santos family would make good on the threat to kill the entirety of Rivas Ramirez's family, and that this threat extended to her and her children. She testified that the threat was made "to the family. It could be the brothers. It could be his children, his woman. They simply said family." A.R. 153.

---

[1] Citations to the "A.R." refer to the case's Administrative Record.

During her testimony before the IJ, Petitioner acknowledged that while she was living with her grandmother, no members of the Santos family "c[a]me after" her, "did anything to" her or her immediate family, or even "called [her] on the phone." A.R. 131, 149–50. Nonetheless, Petitioner testified that she continued to fear that the Santos family would harm her or her children. Two events in particular buttressed this fear. First, on March 19, 2016, one of Rivas Ramirez's brothers, Mardony, was "killed at a place close to where [Petitioner's] grandmother live[d]." *Id.* at 138. Petitioner explained to the IJ that Mardony's killing left her with a bad feeling that the Santos family was carrying out its threat to kill Rivas Ramirez's family. Second, at some point after Mardony's death, Petitioner observed "a daughter of the Santos" family at a location that was approximately 15 minutes away from her grandmother's house. *Id.* at 143–44. Though Petitioner believed that she managed to go undetected by the Santos family member on this occasion, she still feared that this experience meant "that the Santos were close by to [her] grandmother's house." *Id.* at 144.

After living with her grandmother for a year and a half, Petitioner and her two children fled Honduras for the United States because Petitioner was apprehensive that "the Santos family would find [them] like they found Mardony." A.R. 180. The family arrived in the United States on June 3, 2016, without inspection or admission. Six months later, another brother of Rivas Ramirez's, Walter, was killed. Petitioner learned of Walter's death through a text message exchange with one of Walter's nieces. The niece informed Petitioner that her family believed that the Santos family -- "the only ones who they . . . had problems with" -- was responsible for Walter's killing. *Id.* at 139.

4

B.

Petitioner's removal proceedings began on June 15, 2016, when the Department of Homeland Security served separate Notices to Appear on Petitioner and each of her two children. The Notices to Appear charged that Petitioner and her children had entered the United States without valid entry documents and therefore were subject to removal from the United States. On January 4, 2017, Petitioner appeared before the IJ and, through counsel, conceded to service of the Notices to Appear and admitted the factual allegations contained therein. Petitioner then filed an application for asylum, withholding of removal under the INA, and protection under the CAT. In her application, Petitioner stated that she was seeking asylum and withholding of removal based on her status as a family member of Rivas Ramirez. Petitioner listed her children as derivative beneficiaries of her application.[2]

On May 2, 2017, the IJ held a hearing to consider Petitioner's claims for relief. Petitioner appeared at this hearing and, through a translator, testified about her experiences in Honduras and the circumstances giving rise to her decision to flee to the United States with her two children.

---

[2] Although Petitioner listed her children as derivative beneficiaries of her application for asylum, withholding of removal, and protection under the CAT, she did not file separate applications on their behalf. This court has made clear that "the statute permitting withholding of removal does not encompass derivative withholding claims . . . ; instead, an [individual] seeking withholding of removal must establish that *they* will suffer harm if removed." *Niang v. Gonzales*, 492 F.3d 505, 513 (4th Cir. 2007) (emphasis in original). We have not squarely addressed whether derivative claims may attach to claims for relief under the CAT. We need not reach this issue today, because, as discussed *infra*, the IJ and BIA did not err by denying Petitioner's CAT claim.

In a written decision published on December 13, 2017, the IJ denied Petitioner's claims for asylum, withholding of removal, and protection under the CAT. The bulk of the IJ's decision was devoted to analyzing Petitioner's asylum claim. As an initial matter, the IJ found that Petitioner testified credibly, inasmuch as her "testimony was generally consistent with the evidence of record" and there were no "sufficient specific, cogent reasons to support an adverse credibility determination." A.R. 65. Despite finding Petitioner's testimony to be credible, however, the IJ "deem[ed] corroborating evidence necessary in evaluating her asylum claim." *Id.* The IJ held that Petitioner had failed to introduce sufficient evidence to corroborate her testimony, and "denie[d] [Petitioner's] application for asylum" on that basis. *Id.* at 67. The IJ stated that she considered the following corroborating evidence before reaching this conclusion: Petitioner's own sworn statement, a police report about Rivas Ramirez's murder, Mardony's death certificate, a news article written about the Santos family, and a report about human rights conditions in Honduras authored by the United States Department of State.

Though the IJ's decision to deny Petitioner's asylum claim was primarily based on the finding that Petitioner failed to corroborate her testimony, the IJ identified two additional perceived flaws in Petitioner's asylum claim, which the IJ labeled "alternative holding[s]." A.R. 67. First, the IJ held that, even "[a]ssuming without deciding that status as a member of . . . Rivas Ramirez's immediate family may constitute a particular social group," Petitioner had "not established [that] a nexus exist[ed] between her" fear of future harm and her membership in that group. *Id.* at 68, 70. Second, the IJ held that Petitioner had not established "that her fear of returning [to Honduras] [was] objectively reasonable."

6

*Id.* at 71. This was because, in the IJ's view, Petitioner had not demonstrated that "it would be unreasonable for her to [safely] relocate within Honduras," *id.* at 71, or "that the Honduran government [would] be unable or unwilling to protect her from harm in the future," *id.* at 72.

After rejecting Petitioner's asylum claim, the IJ denied Petitioner's claim for withholding of removal under the INA because, the IJ explained, "[a]n applicant who has failed to establish the less stringent . . . standard of proof required for asylum relief is necessarily also unable to establish an entitlement to withholding of removal." A.R. 73 (quoting *Anim v. Mukasey*, 535 F.3d 243, 253 (4th Cir. 2008)).

Finally, the IJ rejected Petitioner's claim for relief under the CAT because Petitioner "failed to establish [that] it [was] more likely than not [that] she would be subjected to torture if returned to Honduras." A.R. 74. Specifically, the IJ found that Petitioner "presented no credible evidence of a clear probability that," if she were returned to Honduras, "she would be tortured by, or at the instigation of, or with the consent or acquiescence of, a public official." *Id.*

Petitioner appealed the decision of the IJ to the BIA, and on May 30, 2019, a single member of the BIA affirmed the IJ's denial of Petitioner's claims for relief. First, the BIA "affirm[ed] the [IJ's] decision to deny asylum for insufficient corroboration." A.R. 4. The BIA also found that there was "no clear error in the [IJ's] determination that [Petitioner] could relocate within Honduras to avoid persecution, and that it would [have been] reasonable for her to do so." *Id.* at 5. "For these reasons," the BIA "affirm[ed] the [IJ's]

decision to deny asylum."[3] *Id.* With respect to Petitioner's withholding of removal claim, the BIA agreed with the IJ that because Petitioner could not establish an asylum claim, she necessarily could "not meet the higher burden for withholding of removal under [the INA]." *Id.* at 5. Finally, the BIA held, "[T]he [IJ] did not clearly err in determining that [Petitioner] did not meet her burden with respect to protection under the [CAT] . . . for the reasons stated in the [IJ's] decision." *Id.* at 5–6.

On June 27, 2019, Petitioner filed a timely petition for review of the BIA's order. Petitioner chiefly contends that the IJ and BIA erred in their evaluation of her corroborating evidence. For the reasons that follow, the petition is denied.

## II.

We review the BIA's legal determinations de novo. *See Alvarez Lagos v. Barr*, 927 F.3d 236, 248 (4th Cir. 2019). The BIA's factual findings, meanwhile, are reviewed "for substantial evidence" and are reversed "only if any reasonable adjudicator would be

---

[3] The BIA did not expressly affirm, or even discuss, the remaining "alternative holding[s]" reached by the IJ -- that (1) Petitioner's testimony, even if corroborated, did not establish a nexus between her asserted social group and her fear of future harm; and (2) the Honduran government would be unable or unwilling to protect her from harm in the future. Our jurisdictional authority "to review an order of removal is limited to the 'final' order." *Mulyani v. Holder*, 771 F.3d 190, 196 (4th Cir. 2014) (quoting 8 U.S.C. § 1252(a)(1)). In the context of removal proceedings, final orders come not from IJs but "from the BIA, the highest administrative tribunal." *Huaman-Cornelio v. B.I.A.*, 979 F.2d 995, 999 (4th Cir. 1992). Thus, our "review of an IJ decision is permissible only to the extent that the BIA adopted it." *Mulyani*, 771 F.3d at 196. Here, because the BIA did not even mention -- much less adopt -- the IJ's findings regarding the lack of a nexus between Petitioner's fear of future persecution and her status as a family member of Rivas Ramirez or the IJ's findings regarding the Honduran government's ability and willingness to protect Petitioner from future harm, we lack jurisdiction to review those findings now.

8

compelled to conclude to the contrary." *Id.* (internal quotation marks omitted). This is a "narrow and deferential" standard of review. *Djadjou v. Holder*, 662 F.3d 265, 273 (4th Cir. 2011). Indeed, "we must affirm the BIA's decision if it is not 'manifestly contrary to law and an abuse of discretion.'" *Cortez-Mendez v. Whitaker*, 912 F.3d 205, 208 (4th Cir. 2019) (quoting 8 U.S.C. § 1252(b)(4)(D)).

It is also important to note that "[b]ecause the decision in this case was issued by a single BIA member, it does not constitute a precedential opinion, as a precedential opinion may only be issued by a three-member panel." *Martinez v. Holder*, 740 F.3d 902, 909 (4th Cir. 2014). Moreover, decisions of single-member panels of the BIA are not an exercise of the BIA's "authority to make a rule carrying the force of law," and accordingly are "not entitled to *Chevron* deference." *Id.* at 909–10.

III.

A.

Asylum Claim

1.

Statutory Framework

Pursuant to the INA, 8 U.S.C. § 1158(b)(1)(A), the Attorney General possesses the discretion to grant asylum to applicants who are determined to be refugees. The term "refugee" is statutorily defined as an individual "who is unable or unwilling to return to, and is unable or unwilling to avail . . . herself of the protection of, [her home] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Ngarurih v.*

9

*Ashcroft*, 371 F.3d 182, 187 (4th Cir. 2004) (quoting 8 U.S.C. § 1101(a)(42)(A)). As this definition suggests, an asylum applicant may establish refugee status in one of two ways: (1) by demonstrating that she was "subjected to past persecution," which triggers "[a] rebuttable presumption of a well-founded fear of persecution"; or (2) by otherwise demonstrating that she has "a well-founded fear of future persecution." *Djadjou v. Holder*, 662 F.3d 265, 272 (4th Cir. 2011) (internal quotation marks omitted).

"The burden of proof is on the applicant to establish that [she] is a refugee." 8 U.S.C. § 1158(b)(1)(B)(i). Accordingly, an asylum applicant "must establish that race, religion, nationality, membership in a particular social group, or political opinion was . . . at least one central reason" for her past persecution or is "at least one central reason" for her well-founded fear of future persecution. *Id.* Additionally, when an asylum "applicant claims that she fears persecution by a private actor, she must . . . show that the government in her native country is unable or unwilling to control her persecutor." *Orellana v. Barr*, 925 F.3d 145, 151 (4th Cir. 2019) (internal quotation marks omitted).

2.

Corroboration

It is possible for an asylum applicant to establish refugee status through her testimony alone, if the IJ is satisfied "that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii). But, even an asylum applicant whose testimony, like Petitioner's, is deemed credible may be required "to present corroborating evidence" to support her claim. *Arita-Deras v. Wilkinson*, 990 F.3d 350, 357 (4th Cir. 2021). The

REAL ID Act of 2005, which amended the INA's provisions on applicant credibility and corroborating evidence, places the decision of whether or not to require corroborating evidence squarely within the discretion of the trier of fact (most typically, and in this case, the IJ). *See Singh v. Holder*, 699 F.3d 321, 332 (4th Cir. 2012) (explaining that "the IJ's expectation of some form of corroboration . . . falls well within his discretion as the trier of fact under the REAL ID Act's corroboration provision"). Indeed, the REAL ID Act provides that "the trier of fact may require [an asylum] applicant to provide corroborating evidence" if he "is not fully satisfied with" the "applicant's testimony standing alone." *Id.* at 329 (citing 8 U.S.C. § 1158(b)(1)(B)(ii)). However, an asylum applicant is not required to introduce corroborating evidence requested by the trier of fact if the applicant "does not have the evidence" and demonstrates that she "cannot reasonably obtain" it. *Arita-Deras*, 990 F.3d at 357.

Here, Petitioner does not assert that the IJ erred by requiring that she offer evidence to corroborate her testimony. Nor should she. The IJ's conclusion that Petitioner's testimony was incapable, in itself, of establishing her refugee status is justified by the fact that Petitioner's testimony relied heavily on secondhand information. For instance, Petitioner did not attend Rivas Ramirez's soccer game against the Santos family, so she was not a witness to Rivas Ramirez's killing or the Santos family's alleged threat to kill Rivas Ramirez's family. Petitioner's testimony about these subjects was wholly based on information she obtained through a phone call with one of Rivas Ramirez's sisters-in-law, who did attend the soccer game. Because several of the events that Petitioner testified about, but did not witness, are critical to her asylum claim -- particularly the Santos

11

family's threat to kill Rivas Ramirez's family -- the IJ did not abuse her "discretion as the trier of fact under the REAL ID Act's corroboration provision" by requiring Petitioner to introduce corroborating evidence. *Singh*, 699 F.3d at 332.

Against this backdrop, we consider Petitioner's three claims of error related to the IJ and BIA's determination that she failed to introduce sufficient evidence to corroborate her asylum claim. First, Petitioner asserts that the IJ and BIA placed undue weight on her failure to introduce corroborating statements from Rivas Ramirez's family members in Honduras. Relatedly, Petitioner asserts that the IJ and BIA were required, but failed, to both make a finding regarding the availability of such corroborating statements and also provide her a meaningful opportunity to explain why she was unable to obtain them. Second, Petitioner claims the IJ and BIA accorded insufficient probative value to Mardony's death certificate and her own sworn statement. Third, she claims the IJ and BIA ignored two pieces of important corroborating evidence altogether -- a news article about the Santos family and a police report regarding Rivas Ramirez's death. We will address each in turn.

a.

Failure to Introduce Corroborating Statements from Rivas Ramirez's Family Members

Petitioner first claims the IJ and BIA placed undue weight on her failure to introduce corroborating evidence in the form of written statements from Rivas Ramirez's family in Honduras. Both the IJ and the BIA explained in their written decisions that the absence of this type of evidence from the record was detrimental to Petitioner's ability to corroborate

12

her testimony. We reject Petitioner's contention that this aspect of the IJ and BIA's decisions was in error.

It is the role of the IJ and BIA, not this court, "to weigh the evidence and make the ultimate factual determinations" about issues like the sufficiency of an asylum applicant's corroborating evidence. *Anim v. Mukasey*, 535 F.3d 243, 261–62 (4th Cir. 2008). Moreover, the IJ and BIA's concern about Petitioner's failure to introduce corroborating statements from Rivas Ramirez's family members is supported by the record. As previously explained, there are a number of factual events that are crucial to Petitioner's asylum claim -- most notably, the Santos family's alleged threat to kill Rivas Ramirez's entire family -- that Petitioner did not witness. Petitioner only learned about these events by speaking on the phone with and texting members of Rivas Ramirez's family who had witnessed them. *See* A.R. 136–37 (Petitioner testifying that one of Rivas Ramirez's sisters-in-law informed her of the Santos family's threat); *id.* at 139 (Petitioner testifying that she learned of Walter's death through a text message exchange with one of Walter's nieces). The IJ and BIA did not abuse their discretion in focusing on Petitioner's failure to introduce statements from Rivas Ramirez's family.

To be sure, the IJ and BIA would have abused their discretion had they *required* Petitioner to introduce any particular type of corroborating evidence, such as written statements from Rivas Ramirez's family members. *See Arita-Deras*, 990 F.3d at 358 (vacating and remanding where the IJ required a specific form of corroborating evidence and "categorically reject[ed]" other forms of corroborating evidence introduced by the asylum applicant). But the IJ and BIA did not do that in this case. While both made note

13

of the fact that Petitioner failed to introduce corroborating statements from Rivas Ramirez's family members, neither implied that this exact type of evidence was *required* in order for Petitioner to corroborate her asylum claim. To the contrary, the IJ and BIA considered other forms of corroborating evidence introduced by Petitioner before ultimately concluding that she failed to meet her evidentiary burden. *See* A.R. 4 (BIA analyzing the corroborative value of Mardony's death certificate); *id.* at 66–67 (IJ analyzing the corroborative value of Petitioner's own sworn statement, the State Department's report on human rights conditions in Honduras, and Mardony's death certificate). Thus, we conclude that the IJ and BIA did not attach undue significance to Petitioner's failure to submit corroborating statements from Rivas Ramirez's family members in Honduras.

Petitioner also asserts that, even if the IJ and BIA did not err by overemphasizing the lack of written statements from Rivas Ramirez's family members, they nonetheless erred by: (1) failing to make an express finding regarding whether such statements were reasonably available; and (2) failing to afford Petitioner a meaningful opportunity to explain the statements' absence from the record or otherwise develop the factual record on this point. This component of Petitioner's argument relies primarily on three cases: *Wambura v. Barr*, 980 F.3d 365, 375 (4th Cir. 2020) (holding that if an asylum applicant is required to introduce corroborating evidence, the IJ or BIA must "determine whether the corroborating evidence was reasonably available"), *Lin-Jian v. Gonzales*, 489 F.3d 182, 192 (4th Cir. 2007) (explaining that an asylum applicant must be offered "an opportunity to explain the absence" of corroborating evidence from the record), and *Quintero v.*

14

*Garland*, No. 19-1904, slip op. at 18 (4th Cir. May 26, 2021) (holding that IJs "have a legal duty to fully develop the record in the cases that come before them").

We identify no violation of *Wambura* here. The IJ expressly found "it reasonable to expect" Petitioner to introduce corroborating statements from Rivas Ramirez's family members in Honduras. A.R. 67. The BIA affirmed on this point, concluding that there was "no clear error . . . in the [IJ's] finding that [Petitioner] did not provide *reasonably available* evidence from family members in Honduras who could have substantiated [her] claim." *Id.* at 4 (emphasis supplied). These findings satisfy the IJ and BIA's obligations under *Wambura* and are also supported by the record. When the IJ "determines that [an asylum] applicant should provide evidence which corroborates otherwise credible testimony, such evidence must be provided unless the *applicant* demonstrates that [she] does not have the evidence and cannot reasonably obtain" it. 8 U.S.C. § 1229a(c)(4)(B) (emphasis supplied). While Petitioner argued before the BIA that it was "unreasonable to expect" Rivas Ramirez's family members to supply corroborating statements because doing so would expose them to retaliation from the Santos family, A.R. 18–19, this purported explanation finds no support in the record, and the BIA did not clearly err by dismissing it as speculative. Moreover, considering that Petitioner admitted at her hearing before the IJ that she did not even ask for these statements in the first place, her assertion that Rivas Ramirez's family members would have put themselves in danger by supplying corroborating statements appears to be nothing more than a dubious post hoc justification for a serious deficiency in her asylum claim.

15

We likewise discern no reversible error under *Lin-Jian* or *Quintero*. After listening to Petitioner testify about the Santos family's threat to kill Rivas Ramirez's family and the deaths of two of Rivas Ramirez's brothers, the IJ inquired of Petitioner, "[W]hy didn't you get a statement from the family for, for any of this?" A.R. 146. Petitioner's answer to this question was non-responsive: instead of addressing her failure to offer corroborating statements from Rivas Ramirez's family members, Petitioner declared that she was not given a death certificate "after the death of Walter" because "people [did] not want to go and testify" about his death "because of fear" of the Santos family. *Id.* Petitioner now attributes this off-topic answer to difficulties with her translator. She also asserts that, under *Quintero*, the IJ was obligated to seek clarification of Petitioner's non-responsive answer to the IJ's question. However, even accepting Petitioner's representation that problems with her translator precluded her from providing an on-point reply to the IJ's question about her failure to introduce corroborating statements from Rivas Ramirez's family members in Honduras, and acknowledging that the IJ was duty-bound to develop the factual record in this case, we conclude that neither *Lin-Jian* nor *Quintero* necessitates a remand in this case. This is because, over the course of Petitioner's testimony before the IJ, the truth ultimately came out as to why she did not introduce corroborating statements from Rivas Ramirez's family members in Honduras. Petitioner testified that she simply did not ask for the statements. *See* A.R. 145 (Petitioner answering, "No" after being questioned by counsel for the Government about whether she "ask[ed] any of [Rivas Ramirez's family members] to provide [her] with statements"). In light of Petitioner's concession that she never requested statements from Rivas Ramirez's family members in

16

the first place, there was no need for the IJ to afford Petitioner a more meaningful opportunity to explain why the statements were missing from the record or engage in more rigorous fact finding on that subject.

b.

Mardony's Death Certificate and Petitioner's Sworn Statement

Petitioner next takes issue with the minimal corroborative weight the IJ and BIA accorded to two pieces of evidence: Mardony's death certificate and Petitioner's own sworn statement about her experiences in Honduras and her decision to flee to the United States with her two children. We conclude that the IJ and BIA's treatment of this evidence is supported by substantial evidence.

The death certificate merely states that Mardony died at the age of 38 on March 19, 2016 in Colón, Honduras. But, the certificate provides no explanation as to *how* Mardony died. And the IJ found that because the death certificate "did not explain [Mardony's] cause of death" and thus did not confirm Petitioner's testimony that Mardony was murdered, it did "not substantially corroborate [Petitioner's] claim." A.R. 67. The BIA agreed, holding that because the death certificate did "not indicate the cause of [Mardony's] death," it could "not corroborate [Petitioner's] testimony that the Santos family murdered him." *Id.* at 4. Petitioner claims that the IJ and BIA's dismissive treatment of Mardony's death certificate was in error because it involved impermissible "speculation, conjecture, and personal opinion about" the information that *should* have been included "in the death certificate." Pet'r's Br. 12 (citing *Marynenka v. Holder*, 592 F.3d 594, 601 (4th Cir. 2010)).

17

We see no reason to disturb the IJ and BIA's findings regarding the corroborative value of Mardony's death certificate. As noted, the task of weighing the corroborative value of evidence falls squarely within the ken of the IJ and BIA, not this court. *See Anim*, 535 F.3d at 261–62. Of course, the IJ and BIA "must articulate a cogent basis supporting any conclusion that the [applicant's] evidence was insufficient." *Arita-Deras*, 990 F.3d at 356 (internal quotation marks omitted). But so long as this procedure is followed, our deferential standard of review "does not permit a re-weighing of the evidence" unless the nature of the evidence "was such that any reasonable adjudicator would have been compelled" to reach a conclusion contrary to the IJ and BIA's. *Qing Hua Lin v. Holder*, 736 F.3d 343, 350–51 (4th Cir. 2013).

Here, the IJ and BIA articulated a cogent basis in support of the decision to discount Mardony's death certificate: the certificate did not indicate how Mardony died. That is a critical piece of information, such that the IJ and BIA did not engage in impermissible speculation or conjecture by focusing on its absence from the death certificate. Because the death certificate was silent as to Mardony's cause of death, we cannot say that any reasonable adjudicator would be compelled to conclude that the IJ and BIA were wrong to attribute minimal corroborative value to this evidence.

Turning to Petitioner's sworn statement, the IJ accorded diminished corroborative weight to this evidence "because of its subjective nature" and because it "was not produced contemporaneously with [Petitioner's] experiences" in Honduras. A.R. 66 & n.2. Petitioner's argument as to why this dismissive treatment was erroneous is difficult to follow, but the upshot appears to be that her sworn statement should not have been viewed

18

as corroborating evidence to begin with, but rather as an extension of her testimony. She asserts that because her sworn statement was "not *corroborative*," it did "not need to be, and logically never would be, objective." Pet'r's Br. 14 (emphasis in original).

Petitioner's argument is misguided. It is clear that when the IJ evaluated Petitioner's sworn statement, the IJ did so for the purpose of assessing its corroborative value. *See* A.R. 66 (IJ discussing Petitioner's sworn statement immediately after stating that Petitioner had "not sufficiently corroborated her claim for the following reasons").

In any event, the IJ did not err in the evaluation of Petitioner's sworn statement. "An IJ has wide discretion to examine [a sworn statement] for validity and evidentiary weight." *Arita-Deras*, 990 F.3d at 359. We readily conclude that the IJ's dismissive treatment of Petitioner's sworn statement was not an abuse of this discretion and is supported by substantial evidence. Most notably, because Petitioner's sworn statement, like her testimony, is based solely on Petitioner's own experiences, it does nothing to fill in the gaps in Petitioner's firsthand knowledge that led to corroborating evidence being necessary in the first place.

c.

### News Article and Police Report

Lastly, Petitioner claims the IJ and BIA erred by ignoring two pieces of corroborating evidence: "a news article regarding the Santos family" and "a police report regarding . . . Rivas Ramirez's murder." Pet'r's Br. 10. As with Petitioner's first two claims, we identify no reversible error here.

19

The BIA "abuses its discretion when it ignores important evidence supporting an [asylum] applicant's claim." *Arita-Deras*, 990 F.3d at 356. The "wholesale failure to discuss" such evidence is reversible error, *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 249 (4th Cir. 2017), as "it is this Court's responsibility to ensure that unrebutted, legally significant evidence is not arbitrarily ignored by the factfinder," *Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 974 (4th Cir. 2019) (internal quotation marks omitted). These requirements are not satisfied by an IJ or the BIA simply mentioning, but never subsequently analyzing, a piece of legally significant evidence. Indeed, it is the "failure to *engage with* an applicant's evidence" that "hampers [this court's] ability to meaningfully review what was decided below." *Id.* (emphasis supplied).

On this record, we cannot conclude that the IJ and BIA meaningfully engaged with the news article or the police report. While the IJ mentioned the news article and police report when listing all of the corroborating evidence introduced by Petitioner, the IJ never specifically analyzed or made findings on the corroborative value of those two pieces of evidence. The BIA, meanwhile, did not reference the news article or the police report at all in its decision.

But our inquiry does not end there. In order for the IJ and BIA's scant consideration of the news article and the police report to be grounds for vacating the decision of the BIA, at least one of those pieces of evidence must be "legally significant." *Rodriguez-Arias*, 915 F.3d at 974; *see also Arita-Deras*, 990 F.3d at 356 (explaining that the BIA "abuses its discretion when it ignores *important* evidence" (emphasis supplied)); *Ai Hua Chen v. Holder*, 742 F.3d 171, 179 (4th Cir. 2014) (recognizing "that the BIA and IJ are not

20

required to discuss every piece of evidence in the record"). Our cases do not provide a precise definition of the phrase "legally significant evidence" in the context of removal proceedings, but the framework for assessing whether an error committed by the IJ or BIA was harmless serves as a useful guide. Indeed, evidence that was ignored by the IJ and BIA is no doubt legally significant if "it is likely that the IJ [and BIA] would have reached a different outcome if [they] had given [it] due consideration." *Tassi v. Holder*, 660 F.3d 710, 725 (4th Cir. 2011).

i.

Against this backdrop, we first consider the news article about the Santos family. The news article details a series of raids conducted by Honduran law enforcement on several homes owned by the Santos family. According to the article, these raids resulted in the seizure of weapons, ammunition, boats, and other contraband. But the article does not mention the Santos family's killing of Rivas Ramirez or its threat to kill Rivas Ramirez's family. This evidence does nothing to corroborate Petitioner's asylum claim. At most, it suggests that the Santos family operates a violent criminal enterprise in Honduras -- a fact that does not help corroborate Petitioner's claim that *she* was likely to suffer harm at their hands if returned to Honduras. *See Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 284 (4th Cir. 2004) ("Fears of . . . general conditions of upheaval and unrest do not constitute cognizable bases for granting asylum." (internal quotation marks omitted)). Therefore, there is no reason to think that the IJ and BIA would have reached a different outcome with respect to Petitioner's asylum claim had they engaged in a meaningful analysis of the news article.

21

ii.

The legal significance of the police report regarding Rivas Ramirez's killing presents a more difficult question. The police report states that Rivas Ramirez died on July 27, 2014, and that his "apparent [cause] of death" was an "injury produced by a firearm." A.R. 185. The report also indicates that the Honduran police believed that Rivas Ramirez's death was a homicide, that the police had initiated a criminal investigation into his killing, and that two members of the Santos family were the primary suspects in the investigation. Clearly, the police report corroborates the portions of Petitioner's testimony where she stated that Rivas Ramirez was killed by the Santos family.

Unfortunately for Petitioner, death of a family member is not an element of an asylum claim. To make out a viable claim for asylum, Petitioner needs more. She must establish a well-founded fear of future persecution[4] attributable, at least in part, to her status as a family member of Rivas Ramirez. The only evidence linking Petitioner's fear of future persecution to her status as a family member of Rivas Ramirez is the threat that the Santos family allegedly made after killing Rivas Ramirez -- i.e., that they were going to "kill the rest of [Rivas Ramirez's] family." A.R. 136. But Petitioner has no firsthand knowledge of that threat because she was not present when it was allegedly issued. Thus, it was vital for Petitioner to introduce evidence that specifically corroborated her testimony about the

_____

[4] The BIA determined that Petitioner's asylum claim involved only a fear of future persecution, "not . . . past persecution." A.R. 5 n.2. Substantial evidence supports this finding, as Petitioner herself testified that the Santos family neither harmed nor directly threatened to harm her or her children before they fled Honduras and entered the United States.

22

Santos family's threat. *See Arita-Deras*, 990 F.3d at 357 (explaining that corroborating evidence should "be tied to the elements the applicant must prove"); *Darinchuluun v. Lynch*, 804 F.3d 1208, 1210 (7th Cir. 2015) (denying a petition for review where the asylum applicant "did not provide evidence that corroborated the key elements of his claim").

Since the police report deals only with Rivas Ramirez's death, it does nothing to corroborate Petitioner's testimony about the Santos family's threat to kill Rivas Ramirez's family. Indeed, counsel for Petitioner conceded at oral argument that "there was no independent corroborative evidence on that specific point." Oral Argument at 4:18–24, *Nolasco-Figueroa v. Garland*, No. 19-1693 (4th Cir. May 4, 2021), https://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments.

Because Petitioner's testimony about this threat would have been uncorroborated even if the IJ and BIA had considered the police report regarding Rivas Ramirez's death, and because establishing the existence of the threat is critical to Petitioner's asylum claim, we conclude that the police report is not legally significant evidence under the circumstances of this case. Moreover, the fact that the record is utterly devoid of evidence specifically corroborating Petitioner's testimony about the Santos family's threat provides substantial support for the IJ and BIA's ultimate decision to deny Petitioner's asylum claim for lack of corroboration.[5]

---

[5] Because we affirm the IJ and BIA's decision to deny Petitioner's asylum claim on corroboration grounds, we need not consider the alternative basis on which the IJ and BIA denied Petitioner's claim -- that Petitioner's fear of future harm was not objectively (Continued)

B.

Withholding of Removal Under the INA

Petitioner's opening brief does not specifically challenge the BIA's denial of her claim for withholding of removal under the INA. Rather, Petitioner's opening brief only mentions withholding of removal in the context of the CAT. *See* Pet'r's Br. 26 ("The [IJ and BIA] further erred by denying Petitioner Withholding of Removal Pursuant to the Convention Against Torture . . . ."); *see also Singh*, 699 F.3d at 323 (noting that withholding of removal under the INA and withholding of removal under the CAT are distinct forms of relief). Accordingly, Petitioner has waived the right to appeal the denial of her claim for withholding of removal under the INA. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief . . . .").

Regardless, Petitioner's challenge to the BIA's denial of her claim for withholding of removal under the INA fails on the merits. The primary difference between asylum and withholding of removal under the INA is that the latter class of claims "implicates a more demanding standard of proof." *Mulyani v. Holder*, 771 F.3d 190, 198 (4th Cir. 2014). Thus, as noted by the IJ and BIA in this case, an applicant who is unable to make out a viable asylum claim "is necessarily also unable to establish an entitlement to withholding

---

reasonable because she did not establish that she could not safely and reasonably relocate within Honduras. *See Urbina v. Holder*, 745 F.3d 736, 742 (4th Cir. 2014) (declining to "reach the BIA's alternative rationale" for denying a motion for reconsideration after affirming the BIA's "primary basis" for that decision), *abrogated on other grounds by Pereira v. Sessions*, 138 S. Ct. 2105 (2018).

24

of removal" under the INA. *Anim*, 535 F.3d at 253. Because substantial evidence supports the IJ and BIA's decision to deny Petitioner's asylum claim, her withholding of removal claim must fail as well.

C.

Protection Under the CAT

Article 3 of the CAT provides, "No State Party shall expel, return[,] or extradite a person to another State where there are substantial grounds for believing that [she] would be in danger of being subjected to torture." *Mironescu v. Costner*, 480 F.3d 664, 666 (4th Cir. 2007). To establish a viable CAT claim, an applicant must "demonstrate[] that it is more likely than not that [she] will be tortured if returned" to her country of origin. *Zelaya v. Holder*, 668 F.3d 159, 161 (4th Cir. 2012). For purposes of the CAT, torture is defined as:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession[,] punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

*Mironescu*, 480 F.3d at 666 n.1 (second alteration in original).

The IJ and BIA rejected Petitioner's claim for relief under the CAT because they found that Petitioner did not establish "a clear probability that she would be tortured by, or at the instigation of, or with the consent or acquiescence of" the Honduran government.

25

A.R. 74. Petitioner claims that this holding is erroneous because it stemmed from the IJ "impermissibly cherry pick[ing]" evidence. Pet'r's Br. 27 (internal quotation marks omitted). Petitioner asserts that if the IJ and BIA had properly considered the totality of the evidence, they would have recognized "that the Honduran government did not even attempt to investigate the murder of . . . Rivas Ramirez," thereby demonstrating a substantial likelihood that it would "show a willful blindness" to any torture suffered by Petitioner or her children at the hands of the Santos family. *Id.* at 28.

It is true that an applicant for relief under the CAT need not demonstrate a probability of her home country's government playing an *active* role in her future torture. On the contrary, "[p]ublic officials breach their [CAT-imposed] responsibility to intervene [against torture] when they engage in willful blindness or turn a blind eye to torture." *Rodriguez-Arias*, 915 F.3d at 971 (internal quotation marks omitted). Still, substantial evidence supports the IJ and BIA's determination that Petitioner failed to establish that the Honduran government would engage in such willful blindness. For example, the State Department's report on human rights conditions in Honduras "notes that the Honduran government is taking steps to prosecute those who," like the Santos family, "participate in organized crime." A.R. 75. Furthermore, the police report regarding Rivas Ramirez's death -- a piece of evidence that is at the heart of Petitioner's argument that the IJ and BIA erred by denying her asylum claim -- contradicts Petitioner's contention that the Honduran government sat on its hands after Rivas Ramirez was killed. Indeed, the police report states that the Honduran police launched a murder investigation after Rivas Ramirez's death, and that two members of the Santos family were suspects in that investigation and subjected to

26

"a pending order of capture." *Id.* at 185. Consequently, Petitioner failed to demonstrate that the IJ and BIA erred in denying her CAT claim.

IV.

For the reasons set forth herein, the petition for review is

*DENIED*.