**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1576**

MIGUEL ANGEL IBARRA CHEVEZ,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: December 9, 2021                  Decided: April 15, 2022

Before RICHARDSON and RUSHING, Circuit Judges, and TRAXLER, Senior Circuit Judge.

Petition for Review denied by published opinion. Senior Judge Traxler wrote the opinion in which Judge Richardson and Judge Rushing joined.

**ARGUED:** Maya Rose Tsukazaki, Jeremy Padow, AMERICAN UNIVERSITY, Washington, D.C., for Petitioner. Shahrzad Baghai, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Jayesh Maneklal Rathod, Khatia Mikadze, William Mogtader, Angélicca C. Telles, Immigrant Justice Clinic, AMERICAN UNIVERSITY, Washington, D.C., for Petitioner. Jeffrey Bossert Clark, Acting Assistant Attorney General, Greg D. Mack, Senior Litigation Counsel, Leslie McKay, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

TRAXLER, Senior Circuit Judge:

Miguel Angel Ibarra Chevez (Ibarra) petitions for review of the final order of the Board of Immigration Appeals (BIA) denying his application for protection under the Convention Against Torture (CAT). The Immigration Judge (IJ) found that Ibarra was not credible and that he had failed to show that it was more likely than not he would be tortured if returned to his native country of El Salvador. We deny the petition.

## I.

## A.

Ibarra is a native and citizen of El Salvador. In February 2013, he entered the United States without authorization. In August 2014, he was arrested in Fairfax, Virginia. In September 2014, the Department of Homeland Security (DHS) filed a Notice to Appear charging Ibarra with removability under 8 U.S.C. § 1182(a)(6)(A)(i). Ibarra admitted the charge and was found removable. With the assistance of counsel, Ibarra requested withholding of removal under the CAT, claiming that it is more likely than not he will be tortured by the MS-13 gang, the police, or anti-gang vigilante groups if he is deported to El Salvador. [1]

On December 11, 2018, the IJ held an evidentiary hearing. The substance of Ibarra's testimony was as follows. In June 2011, when he was 15 years old, Ibarra went to stay with his older brother Rene in or near San Salvador during a school vacation. During Ibarra's visit, Rene drove him to a nearby grocery store. While Ibarra was inside, Rene

---

[1] Ibarra also sought asylum and withholding of removal, but he did not appeal the IJ's denial of these forms of relief.

was shot and killed. Ibarra ran outside when he heard the gunshots. Ibarra believes the assailants were men who loitered around a nearby house that displayed MS-13 gang initials. Two witnesses confirmed his suspicions about the assailants, and these witnesses were killed two days later. The police investigated Rene's murder and took Ibarra back to Rene's house. Rene's wife told Ibarra that Rene was killed because he had not paid a monthly rent demanded by MS-13. Ibarra stayed in San Salvador for another month to help his sister-in-law and then returned to his parents' home in Usulután, El Salvador. He does not claim that he was threatened or harmed by the MS-13 gang while he remained in San Salvador.

Ibarra testified that MS-13 gang members in Usulután tried to recruit him into joining the gang over the next two months. When he refused, they assaulted him twice and told him they would kill his parents if he told anyone. They also told him that he would meet the same fate as Rene if he continued to refuse to join. Ibarra testified that his sister and brother received messages that Ibarra would be killed if he did not leave Usulután within three days, so he stopped attending school. He mostly stayed home but would leave to visit family members. Approximately a year and a half later, Ibarra left Usulután for the United States. By this time, he was 17 years old. He does not claim that he was threatened or harmed by the MS-13 gang while he remained in Usulután.

In February 2013, Ibarra left Usulután and unlawfully entered the United States. From there he made his way to northern Virginia where he had family members. In April 2014, a little over a year after he arrived in the United States, Ibarra was caught up in an altercation between two groups outside a restaurant in Virginia, during which he was

3

accidentally stabbed by an MS-13 gang member named Wilber Hernandez. Ibarra knew Wilber, and he knew Wilber was MS-13. Ibarra gave Wilber's name and telephone number to the police. Wilber pled guilty to two counts of unlawful wounding. In November 2016, Wilber was deported to his home country of Honduras.

While in the United States, Ibarra acquired several non-gang tattoos. Ibarra testified that he "investigated" and "researched" his tattoos ahead of time "so [he] wouldn't have any problems with the gangs." A.R. 305. However, Ibarra stated that some people in the United States believe he is a gang member because he has tattoos and friends who are in gangs. But he denied that he is a member of a gang and denied having ever been involved in gang activity.

In support of his testimony regarding his alleged experiences in El Salvador, Ibarra submitted Rene's death certificate and his sister Rosibel's written declaration. Rosibel stated that she was also 15 years old when Rene was killed and that she and her brother Fernando received calls and texts from unknown persons threatening to kill Ibarra if he did not disappear. At the direction of the police, she and Fernando changed their phone numbers so the gang could no longer contact them.

The DHS submitted copies of Ibarra's criminal history in the United States. This included a March 2017 incident in which Ibarra was identified—by the victim and a police officer who had investigated the 2014 stabbing—as the person who sent threatening audio and video recordings on Facebook to a Salvadoran woman who had witnessed a MS-13 gang murder. These threats included "pictures of [Ibarra] with the El Salvador tattoo on his back, posing with MS hand signs, [and] other MS symbols with guns and ammunition,"

4

A.R. 734. There was also a record of a December 2017 incident during which Ibarra pulled a Ka-Bar knife on a security guard who was escorting him out of a restaurant after he became aggressive and combative. The security guard stated that Ibarra threatened that he would return the next day "with his Gang friends and hurt lots of people." A.R. 740.

Ibarra's request for CAT relief is based on his claimed fear that he will be tortured by the MS-13 gang if deported to El Salvador because of Rene's murder and his refusal to join the gang in 2011, and because the gang might learn of his cooperation with the police in Virginia in 2014. Ibarra also claims that he fears he will be tortured by the El Salvador police and vigilante groups because they might mistakenly believe he is a member of a gang because he has tattoos and a criminal history in the United States. In support, Ibarra presented the testimony and declaration of Ellen Moodie, Ph. D.; a declaration of Tommie Sue Montgomery, Ph. D.; documentary evidence of country conditions; and a translation of Salvadoran Decree 717, which was passed by the government in 2017 as a means of identifying, tracking, and, in some cases, detaining deportees with suspected gang ties.

At the hearing, Dr. Moodie was offered as an expert in country conditions in El Salvador, but not "necessarily specifically about" Ibarra. A.R. 345. Her testimony was based upon "the situation in El Salvador and what happens to people . . . in similar situations to" Ibarra. *Id.* On this basis, Dr. Moodie testified that Ibarra was at significant risk of torture by MS-13 because of his brother's murder and his refusal to join the gang in 2011. Dr. Moodie also testified that it was "possible that [the] MS-13 members in the United States . . . will find out that [Ibarra] was a police informant and relay that news to the MS-13 in El Salvador." A.R. 474. In addition, Dr. Moodie felt that law enforcement

5

officials would likely "be suspicious of him, due to his tattoos and status as a deportee who has a police record in" the United States, *id.*, although she acknowledged at the hearing that she was not aware of any examples of the United States government informing the Salvadoran government about a deportee's gang status. She testified that under current anti-gang initiatives, young men who are suspected of being gang members are very possibly going to be "focused on," "harassed," and perhaps "arrested just looking like a gang member." A.R. 349. Finally, Dr. Moodie testified that vigilante squads, which are sometimes "composed of police officers as well, you know, people who feel like the government had not done anything to stop the rise of gangs," have been "known to have been arrested for killing people. . . just for people being suspected gang members." *Id.* Dr. Montgomery agreed, also based on Ibarra's written declaration and generalized country conditions, that Ibarra would face a significant risk of torture if deported. However, Dr. Montgomery assumed that the MS-13 gang in Virginia was unaware of Ibarra's cooperation in 2014 because his family in El Salvador would have already been threatened. Dr. Montgomery also reviewed photographs of Ibarra's tattoos and agreed that they are not gang related.

The documentary evidence of country conditions, which include State Department and Congressional Research Service reports, generally discuss gang violence and police corruption in El Salvador, as well as El Salvador's efforts to address these issues. The latter also speaks to the criminal records of deportees, stating that DHS "does not provide a complete criminal record for deportees," but "may provide some information regarding an individual's criminal history when specifying why the individual was removed from the

6

United States." A.R. 713-14. DHS "does not indicate gang affiliation unless gang affiliation is the primary reason why the individual is being deported." A.R. 714. Ibarra does not contend that he is being deported due to his criminal record or his suspected gang affiliation.

B.

In her first written decision, the IJ made an adverse credibility finding against Ibarra and found that he had failed to show that it was more likely than not he would be tortured if returned to El Salvador. The credibility determination was based upon internal inconsistencies during Ibarra's testimony at the hearing *and* inconsistencies between his testimony and prior declarations. Among a host of other reasons, the IJ found Ibarra's claim that he is not and has never been an MS-13 gang member implausible and inconsistent with the evidence. The IJ also found Ibarra's claim that MS-13 would seek to harm him implausible because he had lived safely in El Salvador for nearly two years after Rene's murder and for another four years in the United States while living near and interacting with MS-13 gang members.

The IJ also found insufficient independent evidence to corroborate Ibarra's otherwise incredible claims regarding his experiences with gangs in El Salvador and the United States. Rosibel's declaration was "vague and lack[ed] sufficient detail, such as dates, to corroborate" Ibarra's testimony. A.R. 121. And even if it had been detailed and consistent with Ibarra's testimony, it was "not the independent evidence necessary for corroboration." *Id.* (citing *Gandziami-Mickhou v. Gonzales*, 445 F.3d 351, 359 (4th Cir.

7

2006)).[2] Rene's death certificate confirmed that he died of gunshot wounds, but it likewise provided no details to corroborate Ibarra's claim that Rene was murdered by MS-13 gang members, and Ibarra did not submit a police report from the investigation.

Regarding the expert evidence, the IJ found Dr. Moodie's testimony credible insofar as it was "very informative with regards to the country conditions and gang violence in El Salvador," but found that it "provide[d] only generalized information about the conditions in the country" and "did little to corroborate [Ibarra's] individual claims or rehabilitate his incredible testimony." A.R. 121. In addition, Dr. Moodie was "surprised to learn of [Ibarra's] suspected gang involvement," further indicating that "she had limited knowledge of the details" of Ibarra's claim. *Id.* The documentary country-conditions evidence likewise provided only generalized information and did not independently corroborate Ibarra's personal claims or rehabilitate his testimony.

Ibarra did not challenge the IJ's adverse credibility determination before the BIA, and the BIA found no clear error in the IJ's factual finding that Ibarra had received no direct threats since coming to the United States. However, the BIA remanded the case to the IJ for additional analysis of the country-conditions evidence and the likelihood of torture in the aggregate, in accordance with several of our intervening precedents. *See Alvarez Lagos v. Barr*, 927 F.3d 236 (4th Cir. 2019); *Cabrera Vasquez v. Barr*, 919 F.3d 218 (4th Cir. 2019); *Rodriguez-Arias v. Whitaker*, 915 F.3d 968 (4th Cir. 2019).

---

[2] Ibarra testified that Rosibel, who had also entered the United States without documentation, refused to testify in person because she was afraid of being detained.

On remand, the IJ extensively considered the expert and country-conditions evidence, made clear that she had considered the risk from each of the feared entities, both separately and in the aggregate, and again found that Ibarra had failed to demonstrate that it is more likely than not he would be tortured if deported to El Salvador.

Regarding MS-13, the IJ found that the probability of Ibarra's torture was severely diminished by Ibarra's ability to live in El Salvador for nearly two years without significant harm or threats after Rene's murder. He had lived an additional four years in the United States, in an area of this country where there were numerous MS-13 gang members, again without threats or harm, including after he identified an MS-13 gang member as the person who accidentally stabbed him to the police. In addition, Ibarra's belief that gang members in El Salvador might become aware of his cooperation against Wilber was speculative, given that Wilber was deported in 2016 to Honduras, two years before the evidentiary hearing, and neither Ibarra nor his family had received any threats from MS-13 since 2011. This "lack of interest in harming" Ibarra demonstrated that it was not more likely than not that MS-13 gang members would look to torture him upon his deportation. A.R. 96 (citing *Alvarez Lagos*, 927 F.3d at 255-56 (explaining that evidence of direct threats against the respondent, coupled with evidence that gang members continued to ask about her whereabouts after she fled to the United States, could be sufficient to meet her burden under CAT)). The IJ also noted the absence of any evidence that MS-13 would have reason to go to the Salvadoran police to locate Ibarra or that the police would tell MS-13 about his arrival. The IJ also found that Ibarra had not demonstrated that internal relocation to avoid torture was unreasonable. Ibarra failed "to demonstrate that he would not be safe in a

neighborhood controlled by MS-13 when there is indicia that he himself became affiliated with MS-13 after he was stabbed, and he has not been purposely harmed or sought by MS-13 since 2011." A.R. 97. Accordingly, the IJ found that Ibarra's "likelihood of torture from gang members is significantly below fifty percent." *Id.*

The IJ also addressed Ibarra's claim that he is at risk of torture at the hands of the police or anti-gang vigilante groups because of his non-gang tattoos and status as a deportee. Although recognizing the country-conditions evidence that "gang members and suspected gang members are at an increased risk of torture by police and [vigilante groups] than the general public in El Salvador," the IJ found that Ibarra had failed to demonstrate that he faced a particularized risk of significant torture. *Id.* First, even if Ibarra was initially detained or watched by the police under Salvadoran Decree 717, he did not establish that he would likely be targeted for torture as a suspected gang member. Ibarra denies that he has ever been a gang member and his tattoos are not gang related. Second, being detained as a suspected gang member "pursuant to Salvadoran legislation does not constitute torture in itself." *Id.* (citing 8 C.F.R. § 1208.16(a)(3) (stating that torture does not include pain or judicially imposed sanctions and other enforcement actions authorized by law)). And Ibarra "did not provide evidence that most people who are suspected of gang membership [and] taken into custody under Decree 717 are tortured and/or killed, or provide evidence of the number of people tortured and/or killed as a result of being in custody pursuant to Decree 717." A.R. 97. For similar reasons, the IJ found that Ibarra would not likely be tortured or killed by rogue police officers or anti-vigilante groups. If, as he claims, Ibarra is not a member of MS-13 or another gang, there is little risk that these groups would target

10

him or that he would be involved in a gun battle with them. Ibarra's non-gang tattoos and mere status as a deportee were not sufficient to support a finding that he faces a likelihood of torture. *See Castillo-Pena v. Holder*, 482 F. App'x 847 (4th Cir. 2012) (holding that there was insufficient evidence in support of the respondent's claim that he would be tortured by El Salvadoran police because of his tattoos). Accordingly, the IJ found that Ibarra's likelihood of torture from the police and vigilante groups is "significantly less than fifty percent" and that Ibarra's claims were based on "a fear of what *might* happen, rather than evidence that meets [his] burden of demonstrating that it is *more likely than not* that he will be subjected to torture if he is removed to El Salvador." A.R. 98 (cleaned up).

Having considered the potential threat to Ibarra from gangs, the police, and vigilante squads, the IJ found "the threat to [Ibarra] from these sources is less than a fifty percent chance of torture *both separately and in the aggregate*." *Id.* (emphasis added). Accordingly, Ibarra failed to prove it is more likely than not he would be tortured if removed to El Salvador. The case then returned to the BIA, which found no clear error in the IJ's factual findings and concluded that Ibarra had not met his burden of showing that it is more likely than not that he would be tortured if removed to El Salvador. This petition for review followed.

## II.

"To qualify for relief pursuant to the CAT, an applicant must demonstrate that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Portillo Flores v. Garland*, 3 F.4th 615, 637 (4th Cir. 2021) (en banc) (cleaned up); *see* 8 C.F.R. § 1208.16(c)(2). "When an applicant claims a fear of torture

from multiple entities, the agency must assess the likelihood of torture by aggregating the risk from all sources." *Nolasco v. Garland*, 7 F.4th 180, 190 (4th Cir. 2021); *see Rodriguez-Arias*, 915 F.3d at 972-73 ("[T]he risks of torture from all sources should be combined when determining whether a CAT applicant is more likely than not to be tortured in a particular country"). "Torture is defined as 'any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" *Portillo Flores*, 3 F.4th at 637 (quoting 8 C.F.R. § 1208.18(a)(1)). It is "an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 1208.18(a)(2). It also "does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions. Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty, but do not include sanctions that defeat the object and purpose of the [CAT] to prohibit torture." 8 C.F.R. § 1208.18(a)(3).

An adverse credibility finding is relevant to the CAT determination, but not determinative. *See Camara v. Ashcroft*, 378 F.3d 361, 372 (4th Cir. 2004). Beyond credibility, a determination of whether an individual is more likely than not to face torture if returned to the country of removal includes consideration of "evidence of past torture, whether the individual could relocate to another part of the country where she is not likely to be tortured, evidence of human rights violations in the country of removal, and any other

12

relevant country-specific information." *Singh v. Holder*, 699 F.3d 321, 334 (4th Cir. 2012) (citing 8 C.F.R. § 1208.16(c)(3)).

"When, as here, the BIA adopts and affirms the IJ's decision and supplements it with its own opinion, we review both decisions." *Portillo Flores*, 3 F.4th at 625 (cleaned up). We review the BIA's legal conclusions, including the question of whether the BIA has applied the proper standard of review, de novo. *Id.; see Cruz-Quintanilla v. Whitaker*, 914 F.3d 884, 889 (4th Cir. 2019). "[W]e review factual findings for substantial evidence, treating them as conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Portillo Flores*, 3 F.4th at 626 (cleaned up). "We may also overturn the BIA's determinations if we conclude that the BIA abused its discretion[,]" such as when "it fail[s] to offer a reasoned explanation for its decision, or if it distorted or disregarded important aspects of the applicant's claim." *Rodriguez-Arias*, 915 F.3d at 972 (cleaned up).

## III.

On appeal, Ibarra argues that the IJ failed to properly aggregate the risk of torture under *Rodriguez-Arias*, and that the BIA erred in reviewing the IJ's risk analysis under the clearly erroneous standard.

## A.

*In Rodriquez-Arias*, we joined our sister circuits in holding "that the risks of torture from all sources should be combined when determining whether a CAT applicant is more likely than not to be tortured in a particular country." *Rodriguez-Arias*, 915 F.3d at 973. "Under the aggregation rule, an applicant alleging probable torture from independent

13

sources need not demonstrate that the probability of torture by one of the entities, or for one of the reasons, taken alone, exceeds 50%." *Marqus v. Barr,* 968 F.3d 583, 589 (6th Cir. 2020) (cleaned up). Rather, "the question is whether the cumulative probability of torture by all the entities, or for all reasons, exceeds 50%." *Id.*; *see also Quijada-Aguilar v. Lynch*, 799 F.3d 1303, 1308 (9th Cir. 2015) ("CAT claims must be considered in terms of the aggregate risk of torture from all sources, and not as separate, divisible CAT claims."); *Kamara v. U.S. Att'y Gen.*, 420 F.3d 202, 213-14 (3d Cir. 2005) ("A proper application of the regulations . . . merely requires [an applicant] to establish that it is more likely than not that he faces torture . . . when the two entities are considered together. In other words, [an applicant] is entitled to CAT protection if he is able to demonstrate that the cumulative probability of torture by the two entities exceeds 50%.").

In *Rodriquez-Arias*, the IJ had failed to combine the risks of torture from all the feared sources before determining whether the applicant was more likely than not to be tortured if deported to El Salvador. Specifically, the IJ had combined the risks that the applicant faced from gangs and the police in her first decision and, on remand, found that the applicant had failed to demonstrate that it is more likely than not that he would be tortured by vigilante groups. But "[a]t no point did she consider the aggregated risk caused by all three entities in unison by adding the probability of torture from each entity and determining whether that sum exceeded 50%." *Rodriguez-Arias*, 915 F.3d at 973.

Here, in contrast, the IJ considered the likelihood of torture by MS-13, police, and vigilante groups, and found that "the threat to [Ibarra] from [all] sources is less than a fifty percent chance of torture *both separately and in the aggregate*." A.R. 98 (emphasis added).

14

Indeed, Ibarra does not argue that the IJ in his case failed to consider the alleged risk posed by each of the three entities, or that the agency failed to combine the risks before determining whether Ibarra had exceeded the 50% threshold for CAT relief. Rather, Ibarra argues that IJ erred in conflating the risk posed by the police with the risk posed by vigilante groups and erred in failing to employ more precise quantitative risk estimates for each feared entity. We disagree.

First, the IJ did not improperly conflate the risks posed by the police and anti-vigilante groups. Ibarra's feared chain of events is that he will first be detained by the police under Decree 717 because they may mistakenly believe he is a member of a gang. This claimed risk applies only to the police, who are charged with enforcing Decree 717, and the IJ considered it as the initial and separate risk that Ibarra claimed he would face if deported. The IJ found that Ibarra would likely be detained by the police upon his arrival in El Salvador, because he was being deported and perhaps because of his tattoos. But Ibarra had failed to present sufficient evidence to demonstrate that he would likely face some particularized risk of harm at their hands. Ibarra denies that he has ever been a member of any gang, in El Salvador or the United States, and the evidence is undisputed that his tattoos are not gang related. Ibarra testified that he made sure, before he obtained his tattoos, that he would not have any problem with the gangs, and Dr. Montgomery reviewed pictures of his tattoos and confirmed that they were not gang related. Also, Ibarra is not being deported because of his criminal history, much less any gang-related offenses. The IJ also found that Ibarra had failed to present sufficient evidence to demonstrate that

police torture of suspected gang members under Decree 717 is widespread. These findings are supported by substantial evidence in the record.

The next purported risk in the chain arises after Ibarra is processed under Decree 717 and released. If he is released because he is not a gang member, the purported risk from the police and anti-vigilante squads in the countryside do overlap. The basis for his fear is that police officers, rogue police officers, or vigilante groups which are often composed of the same, will believe that Ibarra is a gang member due to his tattoos. But if, as he claims, Ibarra is not a member of MS-13 or another gang, there is little risk that these groups would target him or that he would be involved in a gun battle with them. Accordingly, we find no factual or legal error in the IJ's consideration of the risk allegedly posed to Ibarra from police and vigilante groups.

We also find no error in the method in which the IJ aggregated the likelihood that Ibarra would be subjected to torture. There is nothing in the regulations, agency guidance, or our precedents that require the IJ to employ any specific methodology when considering and aggregating the likelihood of risk from multiple entities, nor do they require any specific statistical or quantitative analysis when evaluating the "more likely than not" standard in the regulations. 8 C.F.R. § 1208.16(c)(2), (c)(3). *See e.g., Nolasco*, 7 F.4th at 185; *see Rodriquez-Arias*, 915 F.3d at 973. It is sufficient if the court can tell that the IJ and BIA "combined the threats from each [source] in deciding that [the petitioner] did not demonstrate the requisite likelihood of torture." *Marqus*, 968 F.3d at 589 (rejecting challenge to aggregation where the IJ concluded that the petitioner had not met his burden of proving that he would be tortured by the government or by forces that the government

16

would acquiesce in, and "[n]othing in the BIA's or the IJ's decisions suggest that they failed to consider the petitioner's probability of torture in the aggregate."); *Iraheta-Martinez v. Garland*, 12 F.4th 942, 960 (9th Cir. 2021) (holding that even though "the BIA did not make it perfectly clear that it was performing an aggregate analysis," "[o]n balance, . . . the BIA said enough to convince [the court] that it did, in fact, find that there is a less than a 50% chance that [petitioner] will be tortured by all potential sources of torture . . . in the aggregate."); *Jama v. Wilkinson*, 990 F.3d 1109, 1120 (8th Cir. 2021) (rejecting challenge to the agency's aggregate risk analysis where "[t]he IJ expressly noted that [petitioner] had failed to show individually, or cumulatively, that he will be more likely than not to experience torture for any reason" and "the BIA recognized each alleged basis of torture and adopted the IJ's reasoning"); *Hassan v. Rosen*, 985 F.3d 587, 591 (8th Cir. 2021) (holding that "a separate or lengthy aggregation analysis" is not required; "it is enough that the record indicates the IJ and BIA considered the risk of torture in the aggregate").[3]

Here, the IJ likewise considered and combined the claimed threats from all three of the feared entities and found that the threat to Ibarra from all potential sources of torture was "less than a fifty percent chance of torture both separately and in the aggregate." A.R.

---

[3] *Kamara v. U.S. Att'y Gen.*, 420 F.3d 202, 213-14 (3d Cir. 2005) is not to the contrary. While the court chose numerical percentages of risk to explain the aggregation rule, it did so "for illustrative purposes only." *Id*. at 214, 216 n.12 ("We emphasize, once again, that our above characterization of the likelihood of torture using numerical hypotheticals is for illustrative purposes only. On remand, the BIA should apply the overarching principles (which we have chosen to demonstrate quantitatively), in a qualitative manner.").

98. The BIA found that the IJ's findings were supported by substantial evidence, and we agree. Accordingly, we hold that the agency did not err in its consideration of the aggregate risk of torture.

B.

Ibarra next argues that the Board applied an incorrect standard of review to the IJ's aggregate finding, because it is a mixed question of fact and law. This is a question of law that we review *de novo*. *Cruz-Quintanilla*, 914 F.3d at 889. We hold that the BIA correctly reviewed the IJ's finding under the clearly erroneous standard of review.[4]

We have previously recognized that "an IJ's prediction of future conditions," including the determination of what would likely happen if an applicant is returned to his home country, "is a factual determination[] . . . only reviewable by the BIA under the clearly erroneous standard." *Turkson v. Holder*, 667 F.3d 523, 529 (4th Cir. 2012). This clearly erroneous standard is not unique to reviewing decisions of immigration judges, but rather, constitutes the scope of review generally applicable to factfinding by trial courts. *See id.* at 527-28. "[O]nce the BIA accepts all of the IJ's non-clearly erroneous factual findings regarding the treatment that [the applicant] is likely to receive if removed," the

---

[4] The respondent argues that Ibarra failed to exhaust this claim before the BIA. Although Ibarra did not belabor the point in his arguments to the BIA, he did argue that the BIA should review "de novo . . . questions of law and mixed questions of fact and law, such as whether eligibility for the CAT has been met by the aggregation of all the sources of torture that are feared." A.R. 13. *See Perez Vasquez v. Garland*, 4 F.4th 213, 228 (4th Cir. 2021) ("[A]ppellants need not conjure any magic words to raise an issue before" the BIA, "but simply need to launch the appropriate argument.") (cleaned up). Accordingly, we will address the claim on the merits.

BIA "is free to review de novo whether that treatment meets the legal definition of torture." *Id.* at 530; *cf. Cruz-Quintanilla,* 914 F.3d at 890 (holding that an IJ makes a factual prediction as to what would likely happen upon removal of the applicant, including how public officials will likely respond to the harm the petitioner fears, which is reviewed for clear error, and the BIA only determines de novo whether the IJ's predictive facts rise to the level of acquiescence defined in the regulations).

In *Rodriguez-Arias*, we held that legal error occurred because the IJ had "failed to aggregate [the petitioner's] risk of torture from all of the entities that he fear[ed]." *Rodriquez-Arias*, 915 F.3d at 972. This failure to aggregate the risk from all feared entities ran afoul of the regulation's requirement that the agency, when "assessing whether it is more likely than not than an applicant would be tortured in the proposed country of removal," consider "*all evidence* relevant to the possibility of future torture." *Id.* (quoting 8 C.F.R. § 1208.16(c)(3)). However, *Rodriquez-Arias* did not "recast" the IJ's "finding of likely future mistreatment" at the hands of all feared sources—which remains a predictive factual finding subject to clear error review—into "something other than a factual finding." *See, e.g., Turkson*, 667 F.3d at 529.

Here, the IJ considered the potential threat to Ibarra from MS-13, the police, and vigilante groups, both individually and in the aggregate, and made a predictive factual determination of what would likely happen if Ibarra was removed to El Salvador. This factual finding was "entitled to deference under the clearly erroneous standard." *Turkson*, 667 F.3d at 529. And once the BIA accepted the IJ's non-clearly erroneous factual findings regarding the treatment that Ibarra was likely to receive from all the entities and for the

reasons combined, the BIA properly concluded that Ibarra had failed to meet the ultimate statutory standard for CAT relief. *Id.*

## IV.

Ibarra also argues that the IJ and BIA arbitrarily ignored evidence relevant to his claim and that the evidence was so compelling that no reasonable factfinder could fail to find that Ibarra had shown that it was more likely than not that he would be tortured if removed to El Salvador. We disagree.

"We presume that, in reaching their conclusions, the IJ and the BIA reviewed the evidence presented to them and made their decisions based on the relevant evidence." *Nolasco*, 7 F.4th at 190 (cleaned up). "The BIA and IJ are not required to discuss every piece of evidence in the record, but they must announce their decisions in terms sufficient to enable a reviewing court to perceive that they have heard and thought and not merely reacted." *Id.* at 190 (cleaned up); *see also Casalena v. INS*, 984 F.2d 105, 107 (4th Cir. 1993) (The agency need not "write an exegesis on every contention.") (cleaned up). The IJ and BIA abuse their discretion, however, if they "arbitrarily ignore relevant evidence." *Rodriguez-Arias*, 915 F.3d at 974. The petitioner is entitled to "know that the evidence they present of mistreatment in their home country will be fairly considered and weighed by those who decide their fate." *Id.* (cleaned up). Moreover, "the BIA's or IJ's failure to engage with an applicant's evidence hampers our ability to meaningfully review what was decided below." *Id.* (cleaned up). Therefore, "a wholesale failure by the IJ and BIA to consider evidence of country conditions constitutes reversible error." *Id.* (cleaned up).

20

Here, the IJ and BIA thoughtfully considered the evidence presented by Ibarra and the DHS, including the expert opinions and other country-conditions evidence, in four separate opinions. The crux of Ibarra's argument is that the IJ arbitrarily ignored relevant evidence because she failed to specifically address the final opinions of the experts—*i.e.,* that, based upon their review and acceptance of Ibarra's written declaration as credible, Ibarra faces a significant risk of torture if he is deported to El Salvador. This likelihood of torture, however, constitutes the ultimate factual finding that rested solely with the IJ, and the IJ's decisions more than amply explain why she reached a contrary finding.

Of most significance, of course, is the IJ's finding that Ibarra's account of his experiences in El Salvador and the United States was incredible and implausible given the record, thereby disagreeing with the very premise of the experts' opinions. This adverse credibility finding has never been contested by Ibarra. And while an adverse credibility finding is not dispositive of a CAT claim, the IJ also thoughtfully considered the other evidence and provided clear and cogent reasons for her decision. Ibarra's account of his experiences in El Salvador and the United States was not corroborated by independent, credible evidence, and the remainder of the expert evidence as well as the other country-conditions evidence provided only generalized evidence of country conditions that likewise failed to corroborate his individual claims or rehabilitate his incredible testimony. *Cf. Singh*, 699 F.3d at 334-35 ("The mere existence of a pattern of human rights violations in a particular country does not constitute sufficient ground for finding that a particular person would more likely than not be tortured.") (cleaned up). Accordingly, we find no abuse of discretion.

For similar reasons, we reject Ibarra's assertion that the evidence presented was so compelling that no reasonable factfinder could have failed to find the requisite likelihood of being tortured if he is removed to El Salvador. *See Portillo-Flores*, 973 F.3d at 241. Ibarra's testimony was incredible, implausible, and unsupported by credible, corroborating evidence. Moreover, Ibarra's own testimony demonstrated that he was not seriously harmed or threatened by MS-13 during the month he stayed in San Salvador following his brother's murder, or during the year and a half that he lived with his parents in Usulután thereafter. He lived for the next four years in the United States, in and amongst MS-13 gang members that he claims, in a separate context, communicate regularly with MS-13 gang members in El Salvador, without threats or harm, including after he cooperated with police in a prosecution of an MS-13 gang member who accidentally stabbed him. Nor have any of his relatives been threatened or harmed by MS-13 in either country. Accordingly, the IJ's findings regarding the risk of harm to Ibarra posed by MS-13 are supported by substantial evidence.

The IJ's findings regarding the police and vigilante groups are likewise supported by substantial evidence. Ibarra denies that he is or ever has been associated with any gang, the evidence is undisputed that his tattoos are not gang-related, he is not being deported because of his criminal history or any suspected gang ties, and there is no evidence that the El Salvador authorities will be told that he is a suspected gang member. Although Ibarra's non-gang tattoos might subject him to some scrutiny by the police under Decree 717 and might raise some similar suspicions on the part of a vigilante group, his assertion that these groups "might torture him because they might believe his tattoos are gang related—despite

22

the fact that he testified that his tattoos are not gang related—is, on this record, pure speculation." *B.R. v. Garland*, 26 F.4th 827, 845 (9th Cir. 2022); *see also Andrade v. Lynch*, 798 F.3d 1242, 1245 (9th Cir. 2015) (Although country-conditions evidence supported petitioner's claim that suspected gang members who are deported to El Salvador may be arbitrarily subjected to investigations, detentions, and even abuse, the evidence did not compel the conclusion that petitioner's non-gang tattoos would make it more likely that not that he would be tortured if removed to El Salvador). Accordingly, we hold that the agency did not arbitrarily ignore relevant evidence and the agency's factual findings are supported by substantial evidence.

V.

For the foregoing reasons, the petition for review is denied.

*PETITION FOR REVIEW DENIED*