**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-1722

MARLON IAN MCDOUGALL, a/k/a Marlon Ian McDougal,

Petitioner,

v.

PAMELA JO BONDI, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued:  December 10, 2024                    Decided:  September 5, 2025

Before DIAZ, Chief Judge, and AGEE and RICHARDSON, Circuit Judges.

Petition for review granted; vacated and remanded by published opinion.  Chief Judge Diaz wrote the opinion, in which Judge Agee and Judge Richardson joined.

**ARGUED:**  Aimee Leah Mayer-Salins, AMICA CENTER FOR IMMIGRANT RIGHTS, Washington, D.C., for Petitioner.  Jaclyn Georgette Hagner, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  Brian M. Boynton, Principal Deputy Assistant Attorney General, David J. Schor, Senior Litigation Counsel, Remi O. da Rocha-Afodu, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

DIAZ, Chief Judge:

Marlon McDougall petitions for review of an order of the Board of Immigration Appeals that denied his claim for protection under the Convention Against Torture. The Board concluded that McDougall wasn't entitled to deferral of removal because he failed to show that Guyanese officials would specifically intend to torture him, or that the Guyanese government would acquiesce to his torture by others.

McDougall argues that the Board erred by ignoring relevant evidence and misapplying the definition of torture. We agree with his first argument, so we leave his second for another day.

Accordingly, we grant the petition for review, vacate the Board's decision, and remand to the agency for further proceedings.

I.

A.

Marlon McDougall (who is Black) is a native and citizen of Guyana. He entered the United States as a lawful permanent resident when he was seven months old, and he has lived here ever since.

McDougall had a difficult childhood; he was physically abused and dealt with depression, anxiety, and substance abuse. As an adult, he began to experience severe paranoia and auditory and visual hallucinations. Until several years ago, his mental illness went untreated.

In 2006, McDougall was arrested on numerous charges—hit and run, eluding, carjacking, burglary, and two counts of assault on a police officer—all allegedly stemming from a psychotic episode.

He took an *Alford* plea.[1]  Though he never denied his guilt, he insisted that he couldn't control himself and wasn't in his right mind.  He served sixteen years in prison.

While incarcerated (and, later, while in immigration detention), McDougall received mental health treatment and began taking medication.  He was diagnosed with schizophrenia.

McDougall also has a severe visual impairment, and knee and ankle injuries that require him to use a wheelchair.

B.

In 2022, the Department of Homeland Security charged McDougall as removable under 8 U.S.C. § 1227(a)(2)(A)(iii) for an aggravated felony conviction.  The immigration judge concluded that McDougall was removable based on his carjacking conviction.

McDougall sought deferral of removal under the Convention Against Torture.  He fears that if he were deported to Guyana, he would be tortured by the public (with the government's acquiescence) and by Guyanese officials, including the police.  He claims that these groups will target him because of his mental health issues, his physical disabilities, his criminal history and status as a deportee, and his race.  McDougall testified

---

[1] An *Alford* plea permits "[a]n individual accused of crime [to] voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." *North Carolina v. Alford*, 400 U.S. 25, 37 (1970).

3

about these fears before the immigration judge and submitted evidence of the mistreatment that members of these groups face.

Mark Tull, a psychotherapist with experience working in Guyana, testified about the risks for mentally ill people there:  There are few resources.  And when the mentally ill are mistreated, police turn a blind eye.  J.A. 372.  Tull predicted that "[McDougall] will actually be a target" for such mistreatment because of his mental health issues and the fact that he would have no support in Guyana.  J.A. 199.

McDougall's aunt submitted an affidavit about the mistreatment criminal deportees and Black people face in Guyana.[2]  When she traveled there a few years ago, she "saw people who had been deported [back to Guyana] and were killed."[3]  J.A. 365.  She stated that, in her experience, the police refuse to help Black people.

McDougall also submitted articles (1) describing poor conditions in prisons and mental health facilities; (2) reporting instances of the police killing and abusing Black people and those who are mentally ill or physically disabled; and (3) claiming that the police turn a blind eye to the same acts committed by the public.

---

[2] Guyana was first a Dutch colony and then a British one.  The Dutch brought enslaved Africans to Guyana to work on plantations, and after slavery was abolished in the colony, the British brought indentured workers from India to do the same.

According to the most recent national census, the Guyanese population consists of four predominant ethnic groups: roughly 40% of the population is East Indian, 30% is of African descent, 20% is multiethnic, and 10% is Indigenous.  CIA, *Guyana*, The World Factbook,  https://www.cia.gov/the-world-factbook/countries/guyana  [https://perma.cc/4LVK-ZG2R] (2012 estimates).  An "ethnocultural divide has persisted" between the two largest groups.  *Id.*

[3] McDougall also learned that his criminal history was in the news in Guyana and that a man had threatened him.

4

C.

The immigration judge denied McDougall's claim. Though the judge found Tull and McDougall credible, she concluded that McDougall failed to show that it was more likely than not that he'd be tortured in Guyana.

First, the judge found that the Guyanese police don't "actively seek to harm mentally ill persons or torture them." J.A. 107. And (in her view) the evidence didn't support "government acquiescence [given that] officials who are accused of wrongdoing are subsequently investigated for such misconduct." J.A. 107.

Second, she concluded that because a lack of training and mental health resources was a problem when police encountered individuals with mental illnesses, the evidence didn't support that police would torture McDougall because of his mental health issues.

Finally, the immigration judge acknowledged that some Guyanese "believe there is a connection between evil spirits and mental health" and that the mentally ill face discrimination there. J.A. 108. Even so, the judge found that the record didn't support the conclusion that McDougall would be tortured by members of the public (or, if incarcerated, by other inmates) or that the government would acquiesce in such torture.

Accordingly, the immigration judge denied protection under the Convention and ordered McDougall deported to Guyana.

D.

McDougall appealed to the Board of Immigration Appeals. He argued (as relevant here) that the immigration judge committed two errors. First, the immigration judge focused only on the likelihood of torture related to mental illness and failed to consider

5

(and thus failed to aggregate) evidence of a likelihood of torture for the other reasons McDougall asserted—his race, his status as a criminal deportee, and his physical disabilities. Second, the judge misapplied the regulatory definition of torture.

The Board affirmed. Like the immigration judge, the Board focused only on potential torture related to McDougall's mental illness.

The Board found "no clear error in the . . . finding that [McDougall hadn't] shown any public official in Guyana would specifically intend to torture him" because he is mentally ill. J.A. 4. In its view, the Guyanese government's efforts to provide additional mental health resources and training supported the immigration judge's finding that "any harm that may befall [McDougall] would not be specifically intended to torture him." J.A. 5. Instead, said the Board, the record showed "that the Guyanese police inflict harm due to a lack of awareness of mental illness and sufficient training to deal with its manifestations." J.A. 5.

According to the Board, McDougall also failed to establish that the Guyanese government would acquiesce to his torture by the public. The Board found that "[w]hile cultural norms in Guyana may stigmatize mental illness, [McDougall]'s cited evidence that crime victims often violently beat criminals in Guyana establishes only a speculative and generalized fear of harm from the public, not a particularized risk of torture by or with the acquiescence of the government." J.A. 6–7. And McDougall failed to provide "any other persuasive evidence that the Guyanese government would fail to intervene if made aware of his torture." J.A. 7.

6

The Board rejected McDougall's appeal, and this petition for review followed.[4]

## II.

Where, as here, the Board "issue[s] its own detailed opinion affirming the [immigration judge] with further reasoning of its own but without expressly adopting the [immigration judge]'s opinion," we review only the Board's decision.[5] *Wambura v. Barr*, 980 F.3d 365, 368 n.2 (4th Cir. 2020).

We may consider both legal and factual challenges to the Board's decisions under the Convention Against Torture. *Nasrallah v. Barr*, 590 U.S. 573, 576 (2020). We review factual findings for substantial evidence, meaning those findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* at 584 (quoting 8 U.S.C. § 1252(b)(4)). We review legal questions de novo. *Lopez-Sorto v. Garland*, 103 F.4th 242, 253 (4th Cir. 2024).

Factual findings include the agency's predicted outcome after removal—its assessment of "what will likely happen to [McDougall] if he returns to [Guyana]." *Turkson v. Holder*, 667 F.3d 523, 529 (4th Cir. 2012). Legal questions include "whether the agency applied the correct legal standard to determine the likelihood of torture," *Lopez-Sorto*, 103

---

[4] The Government asserts that the petition for review is timely under 8 U.S.C. § 1252(b)(1). We accept that admission, as § 1252(b)(1)'s deadline isn't jurisdictional, and the Government doesn't seek dismissal on that ground. *Riley v. Bondi*, 145 S. Ct. 2190, 2203–04 (2025).

[5] Even if we were to consider the immigration judge's opinion, it suffers from the same flaws as the Board's opinion.

F.4th at 253, and whether the agency's predicted outcome "amounts to 'torture,'" *Turkson*, 667 F.3d at 529.

We may "overturn the [Board]'s determinations if we conclude that [it] abused its discretion." *Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 972 (4th Cir. 2019). The Board abuses its discretion when it "fails to offer a reasoned explanation for its decision" and when "it distorts or disregards important aspects of the applicant's claim." *Portillo Flores v. Garland*, 3 F.4th 615, 626 (4th Cir. 2021) (en banc) (citation omitted). It's also an abuse of discretion for the Board to "arbitrarily ignore relevant evidence" or commit a legal error. *Id.* at 634–35 (citation omitted).

## III.

## A.

To warrant protection under the Convention, an applicant must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). Because McDougall asserts multiple potential reasons why he is likely to be tortured, he's entitled to protection so long as "the cumulative probability of torture by all entities, or for all reasons, exceeds 50%." *Kouyate v. Garland*, 122 F.4th 132, 142 (4th Cir. 2024) (cleaned up), *cert. denied*, No. 24-6792, 2025 WL 1426729 (U.S. May 19, 2025).

"Torture" is defined as

any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as . . . punishing him or her for an act he or she or a third person has committed or is suspected of

8

having committed, intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity. . . .

8 C.F.R. § 1208.18(a)(1). Breaking that down, a person commits an act of torture by (i) inflicting "severe [physical or mental] pain or suffering," *id.*, (ii) with the "specific[] inten[t] to inflict severe physical or mental pain or suffering," *id.* § 1208.18(a)(5), (iii) for a prohibited purpose, and (iv) the person acts either in an official capacity, i.e., "under color of law," or not in an official capacity but with the consent or acquiescence of a person acting in an official capacity, *id.* § 1208.18(a)(1).

Essentially, McDougall must show two things under the Convention: First, that "it is more likely than not that if removed [he] will suffer future mistreatment—that is, [he] will endure severe pain or suffering that is intentionally inflicted." *Alvarez Lagos v. Barr*, 927 F.3d 236, 246 (4th Cir. 2019) (cleaned up). Second, "that this likely future mistreatment will occur at the hands of government [officials] or with the consent or acquiescence of government [officials]." *Id.* (cleaned up).

McDougall argues that the Board failed to consider three of his specific claims (and accompanying evidence) of an increased risk of torture in Guyana for Black people, people with physical disabilities, and deportees with criminal records. He also claims that the Board misapplied the Convention's torture definition.

We agree that the agency ignored relevant evidence relating to McDougall's claims based on race, physical disability, and criminal-deportee status. This was an abuse of discretion, so we grant the petition for review and vacate and remand on that basis.

9

B.

In reviewing a claim under the Convention, the agency must consider "the full panoply of the risk-of-torture evidence" an applicant has submitted—including evidence of multiple sources of torture and reasons for torture. *Garcia v. Garland*, 73 F.4th 219, 233 (4th Cir. 2023) (cleaned up); *see also* 8 C.F.R. § 1208.16(c)(3). It's reversible error for the agency to "arbitrarily ignore relevant evidence." *Rodriguez-Arias*, 915 F.3d at 974.

Of course, the agency isn't "required to discuss every piece of evidence in the record." *Lopez-Sorto*, 103 F.4th at 256 (cleaned up). But its decision must show that it considered the applicant's evidence, and offer "a cogent, articulable basis" for setting aside relevant evidence or finding the evidence as a whole insufficient. *Rodriguez-Arias*, 915 F.3d at 975.

McDougall argues that the Board ignored unrebutted evidence that those who share certain traits of his—Black people, people with disabilities, and criminal deportees—face an increased likelihood of torture in Guyana.

We agree. Though McDougall fears torture related to his mental illness (which the Board did address), he also fears torture for these other reasons. And he presented evidence and arguments in support of those reasons.

McDougall testified that he feared he would be targeted and tortured by police and by members of the public because he's a deportee, has physical disabilities, and is Black. He explained that he had learned his criminal history was "all over the news" in Guyana and that people were "waiting for him." J.A. 333–34.

10

He submitted evidence of heinous acts of violence committed by the police and the public against individuals like him, and accounts of the government's willingness to turn a blind eye to the latter.

Yet the Board (and the immigration judge) focused solely on the likelihood of torture on account of McDougall's mental illness. Indeed, the Board's decision doesn't mention McDougall's argument (and accompanying evidence) that he will be tortured because he's a Black criminal deportee with physical disabilities. While the Board did address McDougall's contention that his mental illnesses would lead to his torture, it was not free to ignore those other "important aspects of [McDougall's] claim." *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011).

The Government, resisting this conclusion, points to two statements from the Board's decision: its conclusions that the immigration judge (1) addressed "evidence of police violence in finding that [police] do not" "intentionally harm people with mental health issues *on account of discrimination and social stigma*" and (2) didn't clearly err in "finding the government does not intend to torture its *citizens*." Respondent's Br. at 38 (emphases in original).

Despite the Government's artful italicization, its reading of both statements is wrong. In context, the statements refer to torture related to mental illness. Neither shows that the Board considered risk-of-torture evidence that was unrelated to mental illness or offers a "specific, cogent reason[] for disregarding [that] credible, significant, and

11

unrebutted evidence." *Orellana v. Barr*, 925 F.3d 145, 152 (4th Cir. 2019). Nor does the rest of the Board's opinion.[6]

By ignoring this evidence, the Board "disregard[ed] important aspects of [McDougall]'s claim" and abused its discretion. *Portillo Flores*, 3 F.4th at 626 (citation omitted). This error alone is sufficient for us to vacate and remand, so we don't address McDougall's argument that the Board misapplied the regulatory definition of torture.

\* \* \*

McDougall has alleged that he would be tortured if deported to Guyana because of his mental illness and other characteristics, including his race, physical disabilities, and criminal-deportee status. In determining whether the aggregate risk of torture is sufficient for relief, the agency must take care to address all of McDougall's evidence and apply the definition of torture precisely to each claim. And it must announce its decision in terms sufficient to assure a reviewing court that it has done so.

Because the Board fell short here, we grant McDougall's petition for review, vacate the Board's decision, and remand for further proceedings consistent with this opinion.

*PETITION GRANTED;*
*VACATED AND REMANDED*

---

[6] The Government also highlights the immigration judge's statement that she "considered the harm from all sources in the aggregate." Respondent's Br. at 37. Because we're reviewing only the Board's decision, the immigration judge's statement is inapposite. Even if we were to consider it, this "boilerplate language" is "insufficient to demonstrate that the agency gave [the evidence] more than perfunctory consideration." *Ai Hua Chen v. Holder*, 742 F.3d 171, 181 (4th Cir. 2014).

12